STATE OF NORTH CAROLINA v. BOBBY GENE WHISENANT

No. 72A82

(Filed 7 July 1983)

1. **Criminal Law § 86.5— questions insinuating other crimes by defendant—proper—explaining witness's acts**

   A prosecutor's line of questioning which suggested that defendant had given a witness stolen property was proper where defense counsel had attacked the witness's credibility by referring to a gas station incident, a specific act, and the prosecution was free to "sustain the character of the witness by eliciting from him evidence explaining those acts, or mitigating their effect."

2. **Criminal Law § 169.2— objections sustained—mere asking of question not prejudicial**

   Where the trial court properly sustained defendant's objection to a question asked of a witness as to whether he knew that defendant was a "convicted felon," the mere asking of this question was not sufficiently prejudicial since there was no "reasonable possibility" that had this question not been asked a different result would have been reached at trial. G.S. 15A-1443(a).

3. **Criminal Law § 102.6— argument to jury concerning statistical percentages—proper**

   In a prosecution for first degree murder, the trial court did not err in failing to sustain defendant's objection to a prosecutor's argument concerning the percentage of people with an A blood type who secrete and who smoke Salem cigarettes since (1) the prosecutor made his statistical argument to the jury after defense counsel had raised the issue, (2) the prosecutor made it clear to the jury that he was "assuming" some of the percentages and that he was using another percentage "as an example," and (3) he was using assumed per-

centages merely as a way of demonstrating that it was more likely than not that defendant was the perpetrator of the murders.

DEFENDANT'S trial began during the 30 November 1981 Session of Superior Court, BURKE County, before *Judge Forrest A. Ferrell.* A jury convicted defendant of the first-degree murder of George William Leonhardt, Sr., and the second-degree murder of Lura Shuping Campbell. Judge Ferrell imposed consecutive life sentences upon the defendant for the two convictions after the jury was unable to agree on the recommendation for punishment. Under N.C.G.S. § 7A-27(a) (1981), defendant appeals to this Court as a matter of right.

*Rufus L. Edmisten, Attorney General, by Assistant Attorney General, Thomas F. Moffitt, for the State.*

*Adam Stein, Appellate Defender, by Malcolm R. Hunter, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Defendant presents on appeal two issues to this Court. First, he contends that certain questions by the prosecutor which "put before the jury irrelevant and prejudicial insinuations that the defendant had committed other serious crimes" denied him a fair trial. For the reasons articulated below we do not agree. Defendant also argues that the trial court committed reversible error by failing to strike one of the prosecutor's arguments which defendant claims "travelled outside the record." We have examined this contention as well and find that the trial court's exercise of discretion was well within the bounds of good judgment.

I.

Defendant was found guilty of the 28 June 1981 murder of George William Leonhardt, Sr., an elderly man who was found dead in the hallway of his large stone house in Morganton. Defendant also was convicted of the murder of Mr. Leonhardt's live-in housekeeper, Lura Shuping Campbell, a 66-year-old woman who was found dead in the middle bedroom of Mr. Leonhardt's house. A recitation of the facts in this case is not necessary for an understanding of the issues defendant raises in this appeal.

## II.

[1]   As noted above, defendant contends that he was denied a fair trial because of the prosecutor's propounding of a line of questions which put before the jury "insinuations that the defendant had committed other crimes." The series of questions about which defendant complains indicated that at one time defendant had stolen a weapon from a service station and given it to the witness. Having examined the context in which this line of questioning was pursued, we hold that it was entirely proper, and thus that defendant is not entitled to a new trial on this issue.

As this Court noted in *State v. Patterson*, 284 N.C. 190, 195, 200 S.E. 2d 16, 20 (1973), "it is a general rule of evidence that in a prosecution for a particular crime the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense." The application of this rule, however, is tempered by another rule which holds such evidence admissible under certain circumstances. That is, "[a]fter a litigant brings out on cross-examination specific acts of an adverse witness for the purpose of impeachment, the party by whom the witness is called may sustain the character of the witness by eliciting from him evidence explaining those acts, or mitigating their effect" even though such evidence would not be competent otherwise because it tends to show as well the defendant's involvement in those specific acts. *State v. Minton*, 234 N.C. 716, 724, 68 S.E. 2d 844, 849-50 (1952). In *Minton*, defense counsel had elicited from a State's witness on cross-examination the admission that at one time the witness had tried to strike the defendant with a pipe. This Court held that it was proper for the witness to testify on re-direct examination that he had used the pipe merely to repel an unprovoked assault made on him by the defendant. A similar result was reached in *State v. Patterson, supra.* After defense counsel elicited on cross-examination the admission from a State's witness that she disliked the defendant and harbored a feeling of ill will toward him, this Court held in *Patterson* that it was proper for the State to elicit during its re-direct examination of the witness the reason for the witness' dislike of the defendant: the witness testified that the defendant had raped her.

In the case at bar, defense counsel cross-examined the State's witness, Billy Carlos Cook, about his criminal record. In par-

ticular, he inquired into Cook's convictions for breaking and entering and receiving stolen goods, convictions which grew out of events that occurred at a Mobil gas station. During that cross-examination, defense counsel sought to imply that Cook had received favorable penal treatment for the Mobil gas station crimes in return for his testimony against defendant in this case. After Cook's credibility had been attacked in this manner, the prosecution, on re-direct examination, attempted to show that the property for which Cook was convicted of having unlawfully received was a rifle that defendant himself had given Cook. Thus, the prosecution apparently was attempting to bolster Cook's credibility when it asked a series of questions designed to show the nature of Cook's participation in the Mobil gas station incident.

The prosecutor's line of questioning which suggested that defendant had given Cook stolen property, therefore, was entirely proper under this Court's holding in *Minton* because after defense counsel had attacked Cook's credibility by referring to the Mobil gas station incident, a specific act, the prosecution was free to "sustain the character of the witness by eliciting from him evidence explaining those acts, or mitigating their effect." *State v. Minton, supra,* 234 N.C. at 724, 68 S.E. 2d at 849-50. *See also State v. Patterson, supra,* 284 N.C. at 195-96, 200 S.E. 2d at 20. Defendant's assignment of error is, therefore, overruled.

[2] Defendant also contends that he is entitled to a new trial because during the cross-examination of one of the defense witnesses, the prosecutor asked the witness whether he knew that defendant was a "convicted felon." We note, however, that the trial court sustained defendant's objection to this question. In essence, then, defendant argues that the mere asking of this question alone was sufficiently prejudicial to warrant a new trial. We cannot agree. As this Court stated in *State v. Campbell,* 296 N.C. 394, 250 S.E. 2d 228 (1979), "[o]rdinarily, the asking of the question alone will not result in prejudice to the defendant." *Id.* at 399, 250 S.E. 2d at 231 (citations omitted). Even assuming that the mere asking of this question might be prejudicial in a given case, we hold that in light of the overwhelming evidence of defendant's guilt in this case, there is no "reasonable possibility" that had this question not been asked a different result would have been reached at trial. G.S. 15A-1443(a) (1978). There was abundant circumstantial evidence tying defendant to the scene of the crime

and with some of the property that was stolen from Leonhardt's home. Further, several witnesses testified that defendant had discussed with them his intention to rob the Leonhardt home; at least one of the witnesses testified that defendant asked him if he wanted to take part in the murders and robbery there.

## III.

[3] Defendant finally contends that he is entitled to a new trial because the trial court failed to sustain his objection and strike an argument by the prosecutor because he contends the prosecutor's argument "travelled outside the record." We hold, however, that the trial court did not err here.

The State introduced evidence at trial that Salem cigarette butts were found in the hallway and on the front porch of Leonhardt's home; that an empty Salem cigarette pack was found in the trash can in defendant's master bedroom; and that while defendant was at the Burke County Sheriff's Department he had smoked several cigarettes, leaving eight Salem cigarettes butts in the ashtray. Saliva and blood samples were taken from defendant. A forensic serologist, SBI Agent W. E. Weis, analyzed blood samples taken from the bodies of the victims and from defendant; Weis also analyzed the cigarette butts sent to him by police investigating this case. In so doing, Weis ascertained that Leonhardt had blood of ABO group "O," that Campbell had ABO group "B," and that defendant had ABO group "A." Weis also determined that defendant was a "secretor" who left traces of his blood group in other body fluids, such as saliva. Furthermore, Weis testified that the cigarette butts found in Leonhardt's house and the eight cigarette butts retrieved from the sheriff department's ashtray were all Salem cigarette butts from which Weis obtained a group "A" secretor reaction, a reaction consistent with defendant's blood group. Weis also stated that in his opinion the victims could not have smoked the cigarettes found at the crime scene.

Based on this evidence, one of the prosecutors, Mr. Greene, argued, in essence, that defendant was the perpetrator of the murder of Leonhardt and his housekeeper because defendant was a member of a group of less than one percent of the general population who had the same characteristics as the person who

had left the Salem cigarette butts at the murder scene. Mr. Greene's statistical argument to the jury was as follows:

And what did the serologist say about that? Well, he said that the ABO grouping, and that's what the defendant, Bobby Gene Whisenant's blood was, was ABO grouping, and that blood grouping, that thirty percent of the population had an ABO grouping. And then he said that of that thirty percent that eighty percent were secretors. That would be, if you're going to figure it out, Mr. Vanderblomen, and I'm not saying this I'm just using this as an example, twenty four percent, and how many of those twenty four percent would you say were nonsmokers? Well, it wouldn't be fifty percent, but assuming that there were fifty percent, that would be twelve percent. And how many of those twelve percent were Salem smokers? And you're reducing it on down of the hundreds of the types of cigarettes that you have, you're going to come up with something about six-tenths of one percent.

MR. VANDERBLOMEN: OBJECTION and motion to stike. There is no evidence of that, Your Honor, EXCEPTION NO. 29.

MR. GREENE CONTINUES: The reasonable and logical deductions from what the serologist testified about secretors, and what the ABO grouping was, and you can take your own collective notice about, smokers and nonsmokers. Say I'm wrong. Say it's seventy five percent. You know. Then how many of those when you put it down, then, it wouldn't be but about twenty-five percent. What I'm saying is Mr. Vanderblomen is wanting to say that eighty percent of the population are secretors, and eighty percent of the people put that cigarette out there in the house. And I say that's ridiculous, and the evidence don't show that. The credible evidence from this case don't show that. That he testified that the ABO grouping was only thirty percent of the population, and I say that if you reasonably deduce from that that eighty percent of those and then subtract whatever you say would be the smokers and the nonsmokers, and then reduce that to what that would be, and then say how many of those hundreds of brands of cigarettes would be Salem cigarette smokers? And that would reduce it on down to where it wouldn't be anything like no eighty percent. It would be closer to less than

one percent than it would eighty percent that Mr. Vanderblomen wants you to believe was putting those cigarettes out there —

MR. VANDERBLOMEN: OBJECTION. He's testifying outside the evidence. Move to strike.

THE COURT: Members of the jury, you will be guided by your recollection of the testimony and evidence in the case. EXCEPTION NO. 30.

When the above portion of the closing arguments is read in context, however, it is clear that the trial court's handling of the matter was entirely proper. We note that in his closing argument, defense attorney Vanderblomen was the first to raise the issue of statistical percentages. In part, Vanderblomen argued as follows:

What do the cigarette butts show? I don't know how many of you are type A blood. And there is no evidence as to how many people with type A blood there are. But people who know, O is most common, and there is O [sic] and B and there is AB. In this case the person who smoked the Salem cigarettes and Mr. Whisenant are Type A secretor [sic]. That means of the A type 80 percent are secretors. What that means is that cigarette butts were most likely smoked by somebody, 80 percent, type A people could have been that person. That's assuming that the cigarettes were smoked by somebody and then dropped there.

Thus, it appears that the prosecutor only made his statistical argument to the jury after defense counsel had raised the issue. Further, a close reading of the prosecutor's argument shows that the prosecutor made it clear to the jury that he was "assuming" some of the percentages and that he was using another percentage "as an example" in his statistical analysis of the evidence. In short, the record indicates the prosecutor, in addressing the defense attorney's statistical argument, was using assumed percentages merely as a way of demonstrating that it was more likely than not that defendant was the perpetrator of the murders. Mr. Greene stated, in part, that "[i]t would be closer to less than one percent than it would eighty percent that Mr. Vanderblomen wants you to believe was putting those cigarettes out there —".

As this Court has stated many times, "argument of counsel must be left largely to the control and discretion of the presiding judge and [that] counsel must be allowed wide latitude in the argument of hotly contested cases." *State v. Monk*, 286 N.C. 509, 515, 212 S.E. 2d 125, 131 (1975) (citations omitted). We hold, therefore, that when the prosecutor's statistical argument is read in context, it is clear that the trial court's exercise of discretion in not striking the prosecutor's argument but instead warning the members of the jury to be guided by their recollections of the testimony and the evidence in the case was well within the bounds of sound judgment.

In sum, therefore, we hold that defendant received a trial free of prejudicial error.

No error.