STATE OF NORTH CAROLINA v. WILLIAM DENNIS MOOSE

No. 600A82

(Filed 3 April 1984)

**1. Criminal Law § 100— participation of private prosecutor—no denial of fair trial**

In a prosecution for first degree murder, there was no merit to defendant's contention that he was denied a fair trial because of the participation of a private prosecutor employed by the family of the deceased in that (1) assistance of the public prosecutor by private counsel is not a per se constitutional violation, (2) the record disclosed that the district attorney was at all times in control of the prosecution, and (3) the "fundamental fairness" of the use of private prosecutors in general are adequately addressed by existing safeguards.

**2. Criminal Law § 169.6— exclusion of evidence detailing a purported "deal" offered to a witness by the State—proper**

There was no error in the exclusion of evidence on re-direct examination of a defense witness which detailed a purported "deal" offered to the witness to enter into plea negotiations since the evidence concerned a collateral matter in that defendant sought to excuse the killing not on grounds that he was intoxicated but rather that the killing was accidental, and since the relevance of the excluded testimony became more tenuous when the jury returned a verdict of guilty on the felony murder charge of which premeditation and deliberation are not necessary elements.

**3. Criminal Law § 102.6— prosecutor's argument to jury concerning racial motivation of murder—proper**

In a prosecution for first degree murder, the prosecutor was properly allowed to allege a racial motive for the murder in his argument to the jury since there was evidence that the victim was black; that he was murdered in a white community; and that the defendant referred to the victim as a "damn nigger," and since the fact had become highly relevant during the trial in light of defendant's denial that he knew that the victim was black; that, as earlier argued by defense counsel, race had no part in the murder; and therefore, that the defendant, in the absence of any motive, had no intention of killing or injuring the victim.

**4. Criminal Law § 102.6— prosecutor's argument to jury—no impropriety**

In a prosecution for first degree murder, a prosecutor's argument that there was no evidence to support defense counsel's insinuation of an "underhanded deal" involving a sentence reduction for one of the witnesses in return for his testimony against the defendant was not improper since the thrust of the prosecutor's argument was to refute what he viewed as defense counsel's suggestion that the State had procured the testimony of the witness by surreptitiously arranging a "deal."

**5. Criminal Law § 135.8— first degree murder—sentencing phase—aggravating factor that murder especially heinous, atrocious, or cruel—insufficient evidence to support**

At the sentencing phase of a prosecution for first degree murder, the trial court incorrectly submitted as an aggravating factor that the murder was especially heinous, atrocious, or cruel pursuant to G.S. 15A-2000(e)(9) where the evidence indicated that the defendant pursued the victim's car without explanation down a road and that, although there was a considerable amount of "wondering" about the intentions of their pursuer, and some very legitimate concern and apprehension engendered by defendant's inexplicable behavior, there was no evidence that either the victim or his companion believed that the ultimate result of the pursuit of their car would be death—at least not until the victim's car pulled off the road, the defendant pulled up alongside the victim's car and a shotgun appeared through the window. In fact, the victim's final utterance, "Oh God, what are they going to do?" suggested that even then, the controlling factor was as much incredulity as it was fear.

**6. Criminal Law § 135.8— aggravating factor that defendant knowingly created a great risk of death to more than one person supported by evidence**

In a prosecution for first degree murder, the evidence supported the submission of the aggravating circumstance that "[t]he defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." G.S. 15A-2000(e)(10). The aggravating factor requires a showing that defendant (1) knowingly created a great risk of death to more than one person, (2) by means of a weapon or device which would normally be hazardous to the lives of more than one person. With regard to the risk element the evidence was sufficient to support a jury finding that the defendant knew there were two people in the front seat of the victim's car; that defendant stopped his car in the parking lot within several feet of the victim's car and fired a shotgun into the occupied vehicle within two or three feet of the victim and his passenger. When a shotgun is fired at close range into the passenger compartment of an automobile, the risk created is not simply a risk of injury but a risk of death, and the risk existed to both occupants of the passenger compartment. As to the weapon element, a Winchester Model 370 single barrel, single shot, breech loading .16 gauge which had been modified to accept a larger caliber .12 gauge shell, fell within the category of weapons envisioned in G.S. 15A-2000(e)(10).

**7. Criminal Law § 135.9— mitigating factor that defendant under influence of mental or emotional disturbance—insufficient evidence to support**

The trial judge in a prosecution for first degree murder properly failed to consider as a mitigating factor that the defendant was under the influence of mental or emotional disturbance at the time of the offense pursuant to G.S. 15A-2000(f)(2) where the basis for the factor was the testimony of a forensic psychiatrist who testified that defendant had a history of repeated alcohol abuse and had a "mixed personality disorder" which was manifested by his inability to deal adequately with frustrations which led to outbursts of temper. The inability to control one's drinking habits or one's temper is neither a men-

tal disturbance nor an emotional disturbance as contemplated by this miti-
gating factor.

**8. Criminal Law § 135.4— sentencing hearing—closing arguments to jury—ref-
erence to victim's rights and suffering of victim proper**

    In the sentencing hearing for a prosecution for first degree murder, there
was   no impropriety in the prosecutor's reference to the victim's rights and
the suffering of the victim in his jury argument.

**9. Criminal Law § 135.4— sentencing hearing—jury argument—references to
Bible**

    In a prosecution for first degree murder, the State inappropriately cited
passages from the Bible and argued in effect that the powers of public officials,
including the police, prosecutors and judges are ordained by God as his
representatives on earth and that to resist these powers is to resist God in his
argument to the jury at the sentencing hearing.

    Justice MARTIN dissenting in part.

    Justices COPELAND and MITCHELL join in this dissenting opinion.

BEFORE *Morgan, J.,* at the 20 September 1982 Criminal Ses-
sion of Superior Court, BURKE County, defendant was convicted
of first degree murder and sentenced to death. He appeals as of
right pursuant to G.S. § 7A-27(a). Heard in the Supreme Court 13
February 1984.

This case arises out of the 26 March 1982 nighttime shooting
death of Ransom Connelly. The evidence for the State tended to
show that the defendant, driving a pickup truck and accompanied
by two women began following closely behind the victim's car for
some period of time, ultimately causing the victim, Mr. Connelly,
and his passenger, Phillip Kincaid, to turn off the road into the
parking lot of a drugstore. The defendant pursued the Connelly
vehicle into the parking lot, pulled up beside it, aimed his shotgun
at the car, and shot Mr. Connelly in the head.

The jury convicted the defendant of first degree murder
based on the theory of premeditation and deliberation, and on the
theory of felony murder, the underlying felony being a violation
of G.S. § 14-34.1 (discharging certain barreled weapons or a
firearm into occupied property). At the sentencing hearing held
pursuant to G.S. § 15A-2000, the court submitted and the jury
found two aggravating factors: that the murder was especially
heinous, atrocious, or cruel; and that the defendant knowingly
created a great risk of death to more than one person by means

of a weapon which would normally be hazardous to the lives of more than one person. The jury found three mitigating factors; determined that the aggravating factors outweighed the mitigating factors; and recommended a sentence of death.

Defendant's assignments of error relate to both the guilt and penalty phases of his trial. For the reasons set forth below, we find no error in the guilt phase. For error in submitting as an aggravating factor that the murder was especially heinous, atrocious, or cruel, defendant is entitled to a new sentencing hearing.

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, for the State.*

*Ann B. Petersen, Assistant Appellate Defender, Malcolm Ray Hunter, Jr., Assistant Appellate Defender, and James R. Glover, Appellate Defender Clinic, UNC School of Law, for defendant-appellant.*

MEYER, Justice.

Additional facts necessary to an understanding of the issues raised on this appeal are as follows: Phillip Kincaid, a surviving eyewitness to the murder, testified that he and Ransom Connelly were driving down Zion Road at about 10:30 p.m. on the night of 26 March 1982. As they crossed the intersection of Zion Road and Settlemyer Road, they noticed a pickup truck. The truck followed them for a distance of 1.3 miles to the intersection of Zion Road and Highway 64-70. The truck followed Connelly's Pontiac Bonneville very closely, repeatedly honking its horn, and bumping the back of the car as it came to a stop at the 64-70 intersection. Although there was no traffic and the pickup truck had numerous opportunities to pass, it did not. The pickup truck continued to follow Connelly's car as it turned left on 64-70, at which point Connelly and Kincaid became alarmed and decided to pull off the road into the parking lot of the Drexel Discount Drug Store. Kincaid watched as the pickup truck drove up along the driver's side of the car, and the barrel of a shotgun emerged from the window on the passenger side of the truck. Kincaid testified that the shotgun remained pointed at them for approximately five seconds before the blast which shattered the driver's window of the Pontiac and killed Ransom Connelly.

The defendant testified on his own behalf to the effect that he and two women, Lynn Whisnant and Carolyn Bradshaw Chapman, left the American Legion Hut on Settlemyer Road in defendant's pickup truck. He and Whisnant were living together at the home of Whisnant's father in Morganton. Defendant had been drinking beer and liquor all day. He pulled up behind a vehicle on Zion Road and attempted to pass it twice. He blew his horn when he reached the stop sign at the 64-70 intersection. He followed the car as it turned left on 64-70 because he was going to visit a friend in Valdese. He attempted to pass the car again, but it veered to the middle of the road. He was carrying two shotguns in the cab of his truck. He asked Whisnant to pass him one of the guns because, "Well, we were sitting there at the stop sign and there were several cars coming by, and he was taking longer than he should to be turning, and stuff, and I, you know, got a little irritated sitting there behind him, and after we turned, you know, the idea struck me to fire over him and scare him."

The defendant placed the shotgun "across the upper part of the door frame, where the window rolls down, inside there. It was laid across that and my leg, with my hand on it." Defendant testified that he remembered being off the road and "the doorpost of the truck being approximately even with the front window of the car." He then testified, "I thought somebody hollered at me, but anyway, I had the impression that I was about to hit something and I swerved to the left, as instinct, to get the truck turned as fast as I could, and as I started to turn, I brought my right hand up to grab for the wheel and the shotgun went off." He maintained that he did not bring the truck to a complete stop, did not aim the shotgun at anyone, and did not know that he had shot anyone until after he was arrested. Nevertheless, immediately after the blast, defendant fled the scene, colliding with another automobile as he entered highway 64-70. He drove his truck into the M & C Auto Parts Store lot, located a short distance down the road, and began to repair a broken fuel line "busted during the impact." Shortly afterwards the defendant and Whisnant were apprehended. Carolyn Bradshaw disappeared before the police arrived. She would not testify at trial.

Lynn Whisnant testified that as they drove down Zion Road defendant did follow a car which she knew to be occupied by two black men. Although she and the defendant had decided to go to

Morganton after leaving the American Legion Hut, when they reached the intersection of 64-70, rather than turning right to Morganton as she had asked him to do, the defendant turned left. He continued to follow the Pontiac until it pulled into the Drexel Discount Drug parking lot. The truck pulled up nearly parallel to the car. She remembered the blast of the shotgun and hearing glass shatter.

Ronnie Glenn Bowen testified for the State. Bowen occupied the same jail cell with the defendant in the Burke County jail and the two discussed the murder of Ransom Connelly. Moose described to Bowen the events leading up to the murder, repeatedly referred to the victim as an "old man" or a "nigger," expressed no regret for his actions, and said he wished that he had shot one of the arresting officers.

The State also offered the testimony of witnesses placing the defendant at the scene of the murder, investigating officers, and a forensic pathologist.

During the sentencing phase of the trial, defendant offered the testimony of his mother, his son, a forensic psychiatrist, and a deputy sheriff. Based on this testimony, the trial judge submitted the following statutory factors in mitigation:

1. The defendant has no significant history of prior criminal activity. G.S. § 15A-2000(f)(1).

2. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. G.S. § 15A-2000(f)(6).

The trial judge submitted the following additional factors in mitigation:

1. The defendant was 29 years of age at the time of the crime.

2. The defendant continued to have a close relationship with his mother.

3. The defendant was the father of three young children and has had a loving relationship with them.

State v. Moose

4. The defendant has had an especially close and loving relationship with his oldest son.

5. The defendant had exhibited good behavior while incarcerated in the Burke County jail.

6. The defendant has skills and abilities in areas of mechanics.

7. The defendant has had a history of alcohol abuse.

8. Other circumstances of mitigating value.

The jury found the following factors in mitigation:

Since his arrest, the defendant has always exhibited good behavior while in the Burke County Jail and has caused no problems there.

The defendant has a history of alcohol abuse.

Any other circumstance or circumstances arising from the evidence which the jury deems to have mitigating value.

GUILT PHASE

[1] I. Defendant first contends that he was denied a fair trial because of the participation of a private prosecutor employed by the family of the deceased. He argues that the private prosecutor was "unusually active in the preparation of the case and had more first hand knowledge regarding the State's case than the district attorney," and that at trial, "the private prosecutor's role was at least as prominent as that of the District Attorney and his assistant." Defendant also urges this Court to abolish the practice of allowing private prosecution in criminal cases, particularly in capital cases.

The law in this State with respect to private prosecutors is clear: absent some evidence that the private prosecutor has in fact ignored the interests of justice in seeking a conviction, his assistance of the public prosecutor is not a per se constitutional violation. *State v. Branch*, 288 N.C. 514, 220 S.E. 2d 495 (1975), *cert. denied*, 433 U.S. 907 (1977); *State v. Best*, 280 N.C. 413, 186 S.E. 2d 1 (1972); *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971), *death penalty vacated*, 408 U.S. 939 (1972); *State v. Carden*, 209 N.C. 404, 183 S.E. 898, *cert. denied*, 298 U.S. 682 (1936).

This Court has, over the years, considered the role of private prosecutors in criminal cases and has, we believe, struck a fair balance between the articulated concern that a private prosecutor's loyalty to his client (usually the family or friends of the victim) may in some way serve to prejudice the rights of a defendant, *see* 50 N.C. L. Rev. 1171 (1972), and the recognition that a criminal prosecution is an adversary proceeding and, as such, the role of the solicitor and the role of privately employed counsel are not necessarily inconsistent. *See State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572. Thus where it is shown that the solicitor consented to the participation of a privately employed prosecutor and retained control and management of the prosecution, no reason exists why such an accepted and well-settled practice, in and of itself, should cause reversal of the case. As we stated in *State v. Best,* 280 N.C. 413, 417, 186 S.E. 2d 1, 4 (1972):

"'. . . While under the present practice officers are appointed or elected for the express purpose of managing criminal business, the old practice survives in most jurisdictions to the extent that counsel employed by the complaining witness or by other persons desirous of a conviction are permitted to assist the prosecuting attorney in the conduct of the prosecution, and, as a general rule, no valid objection can be raised by the accused to allow the prosecuting attorney to have the assistance of private members of the bar . . . . (p. 94) It is within the discretion of the trial court to allow special counsel to aid the prosecuting attorney in the prosecution of a case, and such discretion will be interfered with only on a showing of abuse thereof . . . . In all such cases it is within the discretion of the court to appoint competent counsel to assist, or to permit counsel employed by private parties, or even volunteers, to appear for that purpose.'"

Furthermore, the defendant's concerns over the "fundamental fairness" of the use of private prosecutors in general are adequately addressed by existing safeguards. Private prosecutors, like all attorneys, are officers of the court, bound by the ethical responsibilities set forth in the Code of Professional Responsibility; guided by statutory rules and case law; and always controlled by the trial judge whose overriding concern is to insure orderly and evenhanded conduct in his courtroom.

Nor do we find persuasive the argument that assistance of a private prosecutor results in a "mismatching" of legal talent and experience to a defendant's disadvantage. We know of no law that requires counsel to be equal to or better or greater in number than counsel for the opposition. A criminal defendant is only entitled to effective representation by competent counsel.

The record before us discloses that the district attorney was at all times in control of the prosecution; that he adequately supervised the participation of the private prosecutor; and that the two attorneys worked as a team sharing the workload evenly. In short, the private prosecutor acted well within allowable limits. *See State v. Chapman,* 294 N.C. 407, 241 S.E. 2d 667 (1978). The trial judge did not abuse his discretion in permitting the participation of private prosecution in this case. *See State v. Boykin,* 298 N.C. 687, 259 S.E. 2d 883 (1979), *cert. denied,* 446 U.S. 911 (1980).

[2]    II. Defendant next contends that the trial court erred in refusing to allow evidence enhancing the credibility of Lynn Whisnant after the State had impeached her.

Lynn Whisnant appeared as a witness for the defendant. The purpose of her testimony was to corroborate defendant's assertion that he was highly intoxicated and did not intend to kill the victim, but rather that he intended to shoot over the car. On cross-examination, the State attempted to impeach the credibility of the witness by emphasizing Whisnant's close friendship with the defendant and her own involvement in the crime. On re-direct examination, defense counsel asked Whisnant whether she had been offered "a deal" to change her story as to what, if anything, the defendant said just prior to the murder. She responded in the affirmative. The defense attorney then attempted to elicit from Whisnant the details of "the deal." The State objected and, following a voir dire hearing, the trial judge sustained the State's objection.

During the voir dire hearing it was disclosed that a representative of the State had approached Whisnant's attorney and stated that he would recommend that plea negotiations be commenced in her case if Whisnant had any information tending to show that the defendant had, prior to the murder, made threatening or disparaging remarks concerning the victim, and if she was

willing to so testify. Whisnant testified on voir dire that her attorney had asked her whether she wanted to change her story, but did not reveal to her what the changes might concern or what the plea might involve.

The defendant now argues to this Court that this information was critical to his defense because "(h)er conversations with her lawyer about a plea bargain for her altered or enhanced testimony was powerful evidence that she had a strong interest in saying what the State wanted her to say to save her own neck and that her credibility was enhanced because she testified against her own interests."

We agree with the trial judge that the proffered evidence was not "the major thrust in this case." Certainly the exclusion of evidence on re-direct examination which detailed a purported "deal" offered to Whisnant to enter into plea negotiations did not deny the defendant the right to present his defense of intoxication. In fact, following defendant's testimony it became clear that he sought to excuse the killing not on grounds that he was intoxicated but rather that the killing was accidental. Thus, the excluded evidence concerned a collateral matter, the credibility of a witness, and the trial judge acted well within his discretion in curtailing questioning which had the real potential of resulting in a "mini-trial" on a collateral matter the substance of which was already before the jury. As we recently stated in *State v. McDougall*, 308 N.C. 1, 22, 301 S.E. 2d 308, 321, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 173 (1983):

> It is the duty of the trial judge to supervise and control the trial to prevent injustice to either party. *Greer v. Whittington*, 251 N.C. 630, 111 S.E. 2d 912 (1960). The court has the power and duty to control the examination and cross-examination of the witnesses. *State v. Arnold*, 284 N.C. 41, 199 S.E. 2d 423 (1973); *Greer, supra.* The trial judge may ban unduly repetitious and argumentative questions as well as inquiry into matters of tenuous relevance. *State v. Satterfield*, 300 N.C. 621, 268 S.E. 2d 510 (1980); *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied*, 414 U.S. 874 (1973). The extent of cross-examination with respect to collateral matters is largely within the discretion of the trial judge.

*State v. McLean,* 294 N.C. 623, 242 S.E. 2d 814 (1978); *Ingle v. Transfer Corp.,* 271 N.C. 276, 156 S.E. 2d 265 (1967).

Furthermore, the relevance of the excluded testimony becomes even more tenuous in light of the jury's verdict of guilty on the felony murder charge. Whisnant's testimony that the defendant did not utter threats prior to the murder is merely some evidence tending to negate the elements of premeditation and deliberation, elements not necessary to support defendant's conviction for felony murder. Defendant's second assignment of error is overruled.

[3] III. Defendant contends that the State's closing arguments during the guilt phase of the trial denied him a fair trial. Specifically he contends that the prosecutors improperly emphasized a racial motive for the killing without adequate foundation and injected personal opinions and testimonials in an effort to create sympathy for the victim.

We first note that of the ten exceptions listed under this assignment of error, only one was the subject of an objection at trial. We must determine, therefore, whether these statements, with the exception of the one objected to, "amounted to such gross impropriety as to require the trial judge to act *ex mero motu.*" *State v. Oliver,* 309 N.C. 326, 356, 307 S.E. 2d 304, 324 (1983).

In a criminal trial "[a] prosecutor may argue the evidence and any inferences to be drawn therefrom." *Id.* at 357, 307 S.E. 2d at 324. With respect to the alleged racial motive for the murder, there was evidence that the victim was black; that he was murdered in a white community; and that the defendant referred to the victim as a "damn nigger." With this in mind, defendant now argues that the prosecutor's repeated reference to the victim as an "old black gentleman" and a "black man" were improper. Not only were these references not objected to at trial, but no exception to them has been taken. The evidence that the victim was a black man and that he was driving through a white community, taken together with defendant's ignoble racial slur in referring to the victim as a "damn nigger," is sufficient to raise an inference that the murder was, in part, racially motivated. Indeed, this fact became highly relevant during the trial in light of defendant's denial that he knew that the victim was black; that, as earlier

argued by defense counsel, race had no part in the murder; and therefore, that the defendant, in the absence of any motive, had no intention of killing or injuring Mr. Connelly.

The prosecutor also argued to the jury that the murder was as clearly a premeditated and deliberated murder as any murder he had previously tried; that it must have been a "horrible experience" for Mr. Connelly as he "looked down the barrel of a shotgun"; that Mr. Connelly was entitled to the help he received from a bystander "after that man deliberately murdered him"; that the defendant "succeeded in frightening, scaring Mr. Connelly, but it was all over with him"; and finally that "[t]he blood of Ransom Connelly cries out from the ground to find this man guilty of first degree murder." While we agree that these comments had little relevance to the determination of defendant's guilt or innocence, we do not find them, individually or taken together, to be so grossly improper, prejudicial, or highly inflammatory as to require the trial judge to interfere *ex mero motu*. *See State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975).

[4] Finally, defendant objected to the State's argument that there was no evidence to support defense counsel's insinuation of an "underhanded deal" involving a sentence reduction for Ronnie Bowen in return for his testimony against the defendant. Bowen, an inmate at Central Prison, testified for the State concerning defendant's remarks about the victim. The thrust of the prosecutor's argument was to refute what he viewed as defense counsel's suggestion that the State had procured the testimony of Bowen by surreptitiously arranging "a deal." Prosecutor Greene concluded "my law license means more to me than a first degree murder case." Defense counsel's objection to this statement was, we believe, properly overruled. Defendant "opened the door" to this line of argument. *See State v. Whisenant*, 308 N.C. 791, 303 S.E. 2d 784 (1983); *State v. Fearing*, 304 N.C. 471, 284 S.E. 2d 487 (1981).

## PENALTY PHASE

[5] IV. Defendant first contends that the evidence in this case was insufficient to support a finding of the aggravating factor

that the murder was especially heinous, atrocious, or cruel. G.S. § 15A-2000(e)(9). We agree.

It is clear from the record that in support of this factor the State argued that because the victim was "stalked" for a period of time prior to the murder, he suffered psychological torture in excess of that normally present in a first degree murder case. We agree with the State that where the facts in evidence support a finding that a victim is stalked and during the stalking the victim is aware of it and in fear that death is likely to result, the issue of whether the murder is especially heinous, atrocious, or cruel may be properly submitted for jury consideration.

Thus, the issue before us is whether, as a matter of law, there is sufficient evidence to submit the issue to the jury. As succinctly stated by Justice Martin in his dissenting opinion in the recent case of *State v. Stanley*, 310 N.C. 332, 347, 312 S.E. 2d 393, 401 (1984):

> In making this decision, we must view the evidence in the light most favorable to the state, discrepancies and contradictions are disregarded, the state's evidence is taken as true, and the state is entitled to every inference of fact that may be reasonably deduced therefrom. The defendant's evidence, unless favorable to the state, is not to be considered in deciding the question. If there is substantial evidence of each element of the issue under consideration, the issue must be submitted to the jury for its determination. If the evidence only raises a suspicion or conjecture as to the existence of the fact to be found, the issue should not be submitted. (Citations omitted.)

In the present case, the trial judge conducted a voir dire hearing at which time the State was permitted to present the testimony of Phillip Kincaid for the purpose of attempting to prove that, through a continuing and escalating course of events culminating in the murder, the victim became increasingly fearful for his life, and thereby underwent psychological torture. Kincaid testified that shortly after the defendant appeared behind them, he discovered that he and Mr. Connelly were not being pursued by a police car and informed Connelly of that fact. They "were asking each other, wondering who was that behind us." The vehicle behind them continued to bump them and at the intersection

they thought the truck was going to pull around them. Connelly then said, "Well, maybe we can make it on to Fender's." They continued to wonder "who was that behind us blowing the horn." As they turned into the Drexel Discount Drug Connelly said, "I'll just pull off here, maybe whoever it is will go on by." Kincaid's testimony concluded with:

Q. Was there anything stated about the ability to make it to Fender's?

A. Well, we thought we would have been safe if we got to Fender's.

Q. Was there anything said by Ransom Connelly when the shotgun came out the window and during the time that it was pointed at him and you?

A. He said Oh God, what are they going to do?

Q. What conversation during the entire time, beginning from Zion Road and coming on down No. 64-70 what, if anything, did Ransom Connelly say about wanting the vehicle behind to go on and pass to leave you alone?

A. Yea, he said I wish they'd go ahead and pass and leave us alone.

Kincaid's testimony before the jury essentially paralleled that given during the voir dire hearing. He did state before the jury, however, that they "drove up the road frightened" and that he [Kincaid] "was beginning to get more frightened after [the defendant] wouldn't pass" and "after we pulled off the road, and after the shotgun came out of the window I just froze."

It seems then that although there was a considerable amount of "wondering" about the intentions of their pursuer, and some very legitimate concern and apprehension engendered by defendant's inexplicable behavior, there is no evidence that either Kincaid or Connelly believed that the ultimate result of the pursuit would be death—at least not until the shotgun appeared. In fact, Connelly's final utterance, "Oh God, what are they going to do?" suggests that, even then, the controlling factor was as much incredulity as it was fear.

We do not consider this evidence sufficient to support the State's theory that Ransom Connelly suffered excessive psychological torture as he was being "stalked for the kill."

Because we have held that the submission of the G.S. § 15A-2000(e)(9) factor was error in this case, we deem it unnecessary to address defendant's challenge to the jury instructions on this factor.

**[6]** V. Defendant contends that the evidence was insufficient to support the aggravating circumstance that "[t]he defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." G.S. § 15A-2000(e)(10). This Court has not previously spoken to this particular aggravating circumstance nor to its equivalent in the Fair Sentencing Act — G.S. § 15A-1340.4(a)(1)(g), bearing identical language.[1]

At least five states have similar aggravating factors requiring a risk of death to more than one person by a weapon or device that would normally be hazardous to the lives of more than one person.[2]

The G.S. § 15A-2000(e)(10) aggravating factor requires a showing that defendant (1) knowingly created a great risk of death to more than one person, (2) by means of a weapon or device which would normally be hazardous to the lives of more

---

1. For other terms relating to weapons in various statutes, see for example:

   G.S. § 14-34.1 Barreled weapon, firearm

   G.S. § 14-49 Explosive or incendiary device or material

   G.S. § 14-288.8 Weapon of mass death and destruction

   G.S. § 15A-2000(e)(5) Destructive device or bomb

   2. These states are Georgia, Kentucky, Missouri, Nevada, South Carolina and South Dakota. Ga. Code Ann. § 17-10-30(b)(3); Ky. Rev. Stat. § 532.025(2)(a)(3); Mo. Ann. Stat. § 565.012(2)(3); Nev. Rev. Stat. § 200.033 (3); S.C. Code § 16-3-20-(C)(a)(3); S.D. Compiled Laws Ann. § 23A-27A-1-(2). Only in Georgia do we find cases interpreting this factor. The similar provision in the Georgia Code (Ga. Code Ann. § 17-10-30(b)(3), formerly 27-2534.1(b)(3), containing the language "a weapon or device which would normally be hazardous to the lives of more than one person" has been interpreted by the Georgia Supreme Court to apply to a .32 caliber automatic pistol used in an attack on two 7-11 Store cash couriers. *Jones v. State*, 243 Ga. 820, 256 S.E. 2d 907 (1979). *See Chenault v. State*, 234 Ga. 216, 215 S.E. 2d 223 (1975), where it was found to exist when defendant used two pistols.

than one person. This factor thus addresses essentially two considerations: a great risk of death knowingly created and the weapon by which it is created. We therefore address ourselves to both the risk and the weapon.

With regard to the risk element, the evidence is certainly sufficient to support a jury finding that the defendant knew there were two people in the front seat of Connelly's car. While much of the evidence is conflicting, it is clear that defendant's passenger, Mrs. Whisnant, testified that she knew there were two men in the victim's car and that they were black, and said in a statement given three days after the incident that the driver was wearing a hat and the passenger was not. The defendant virtually drove right on the bumper of the victim's car for the substantial distance of 1.3 miles and in fact bumped it at least twice. The defendant stopped his car in the parking lot within several feet of the victim's car and in fact fired the shotgun into the occupied vehicle within two or three feet of the victim and his passenger. The jury found this evidence sufficient to convict the defendant of felony murder in violation of G.S. § 14-34.1 (discharging certain barreled weapons or a firearm into occupied property). It cannot be said that the defendant did not knowingly create the risk.

When a shotgun is fired at close range into the passenger compartment of an automobile, the risk created is not simply a risk of injury but a risk of death. The risk of death to Connelly and Kincaid was "great" and not merely negligible. The risk did not exist as to only one of the occupants but to both. The fact that only one of the occupants was killed does not refute the fact that both were placed at risk of death.

As to the weapon, the crucial consideration in determining what type of weapon or device is envisioned by G.S. § 15A-2000 (e)(10) is its potential to kill more than one person if the weapon is used in the normal fashion, that is, in the manner for which it was designed. The focus must be upon the destructive capabilities of the weapon or device. Whether used for sporting purposes against game birds, water fowl and animals, or as a weapon against man, the shotgun is selected for the very reason that it is capable of firing more than one, and in fact, many projectiles in a pattern over a wide impact area rather than a specifically aimed single projectile such as from a rifle or pistol. It is used by law

enforcement officers and the military alike for its widespread destructive power in close places or at close range. It is axiomatic that a shotgun is a weapon which would normally be hazardous to more than one person if it is fired into a group of two or more persons in close proximity to one another.

The defendant argues that the modifications made to the shotgun in question increased the muzzle velocity but decreased the size of the pattern (*i.e.*, the amount the pellets spread out), thus making the weapon more discriminating and less dangerous to more than one person, hence, not a weapon normally dangerous to more than one person. We reject this argument. The weapon used in this case, a Winchester Model 370, was a single barrel, single shot, breach loading .16 gauge shotgun which had been modified (the barrel reamed out or bored open) to accept the larger caliber .12 gauge shell. The effect of the modification was to allow the greater amount of gunpowder and pellets of a .12 gauge shell to be fired through the smaller caliber barrel of the .16 gauge. We note that the .12 gauge shell used here was a 3-inch magnum shell and thus contained more powder and shot than a standard 2-3/4 inch shell. We further note that the expert witness testified that the spent shell which was found was a Federal .12 gauge 3-inch magnum No. 4 and would have contained 1-7/8 ounces of shot or approximately 253 pellets (135 per ounce). We further note that only approximately 40 pellets were recovered from the victim's body.

We hold that a shotgun falls within the category of weapon envisioned in G.S. § 15A-2000(e)(10) and that there was sufficient evidence from which the jury could conclude that the defendant knowingly created a great risk of death to Ransom Connelly and Phillip Kincaid by means of a weapon or device which would normally be hazardous to the lives of more than one person. The jury's finding of this factor is supported by the evidence.

[7]  VI. Defendant contends that the trial judge erred when he refused to submit, as a mitigating factor, that the defendant was under the influence of mental or emotional disturbance at the time of the offense. G.S. § 15A-2000(f)(2). The basis for the submission of this factor was the testimony of Dr. Bruce Berg, a forensic psychiatrist, who conducted a pretrial evaluation of the defendant. Dr. Berg testified that defendant had a history of repeated

alcohol abuse and had a "mixed personality disorder" which was manifested by his inability to deal adequately with frustrations which led to outbursts of temper. On the other hand, the State's characterization of defendant was, in short, "a man of average intelligence with a penchant for alcohol and a hot temper."

We agree that this evidence falls short of that necessary to support the submission of G.S. § 15A-2000(f)(2), that the defendant was under the influence of mental or emotional disturbance when he murdered Ransom Connelly. The inability to control one's drinking habits or one's temper is neither a mental disturbance nor an emotional disturbance as contemplated by this mitigating factor. In *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982), we reiterated this Court's position with respect to the definition of mitigating circumstances under G.S. § 15A-2000. That definition and the policy it represents bears repeating:

"A definition of mitigating circumstance approved by this Court is a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, *which may be considered as extenuating, or reducing the moral culpability of killing or making it less deserving of the extreme punishment than other first-degree murders.*"

*Id.* at 178, 293 S.E. 2d at 586 (Emphasis added).

Thus in *Brown*, as we had previously held in *State v. Irwin*, 304 N.C. 93, 106, 282 S.E. 2d 439, 447-48 (1981), we stated that " 'voluntary intoxication by alcohol or narcotic drugs at the time of the commission of a murder is not within the meaning of a mental or emotional disturbance under G.S. § 15A-2000(f)(2). Voluntary intoxication, to a degree that it affects defendant's ability to understand and to control his actions ... is properly considered under the provision for impaired capacity, G.S. 15A-2000(f)(6).' " *Id.* at 179, 293 S.E. 2d at 587. In the present case the trial judge submitted and the jury failed to find as a mitigating factor that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." G.S. § 15A-2000(f)(6).

The burden was on the defendant to prove in mitigation that he was under the influence of mental or emotional disturbance. Here he failed to come forward with any evidence other than that his temper controlled his reason, particularly when he consumed alcohol. Furthermore, the trial judge submitted and the jury found as an additional factor in mitigation that the defendant had a history of alcohol abuse. The submission of G.S. § 15A-2000(f)(2) thus would have been duplicative with respect to defendant's alcohol abuse. The assignment of error is overruled.

VII. Defendant argues next that he was denied a fair sentencing hearing because of the State's closing arguments to the jury. He asserts first that the State injected personal opinion into the argument and misrepresented the standard for the especially heinous, atrocious, or cruel aggravating factor. Because this factor will not be submitted at resentencing, we deem it unnecessary to address this contention.

Defendant additionally asserts that the State impermissibly appealed to racial fears and biases when he argued that the murder was racially motivated. We held in the guilt phase portion of this opinion that arguments relating to the racially motivated character of this murder were supported by the evidence and relevant to refute defendant's contention that he did not intend to harm Mr. Connelly. Likewise, this evidence, and the argument based thereon, was relevant at sentencing to illustrate the depravity of defendant's character. *See State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569; *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* --- U.S. ---, 77 L.Ed. 2d 1398 (1983).

[8] The defendant also argues under this assignment of error that the State injected prejudice into its jury argument by referring to the victim's rights and the suffering of the victim. In *State v. Oliver,* 309 N.C. at 360, 307 S.E. 2d at 326, we stated that during sentencing, where "[t]he emphasis is on the circumstances of the crime and the character of the criminal," arguments concerning the rights of the victim are relevant. *See State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* --- U.S. ---, 74 L.Ed. 2d 1031 (1983). Defendant argues, however, that he was unduly prejudiced by what he alleges was a reference to a letter which had appeared in the local newspaper. There is no evidence that the jurors had

knowledge of the letter. Furthermore, objection was taken to the remark and the trial judge instructed the jury to disregard it. Any prejudice was therefore cured by the trial judge's action. *State v. Lake,* 305 N.C. 143, 286 S.E. 2d 541 (1982). We also note that defense counsel effectively appealed to the sympathy of the jury by arguing that the jury's life or death choice would determine "whether a little boy and girl understand their daddy is alive" and "whether or not that boy's daddy is to die."

**[9]** Finally defendant argues that the State inappropriately cited passages from the Bible and argued in effect that the powers of public officials, including the police, prosecutors and judges are ordained by God as his representatives on earth and that to resist these powers is to resist God. The passage quoted was taken from Romans, Chapter XIII. A similar jury argument was made in *State v. Miller,* 288 N.C. 582, 220 S.E. 2d 326 (1975), but it was not assigned as error or brought forward on appeal before this Court. On petition for federal habeas corpus the Fourth Circuit Court of Appeals in *Miller v. North Carolina,* 583 F. 2d 701 (4th Cir. 1978), noted this argument with disapproval. We likewise disapprove of this argument. The prosecutor is cautioned to avoid it at resentencing.

Defendant's assignments of error numbers 10 through 19 are prefaced as follows: "The following issues are all issues this Court has previously and recently decided against the defendant. He merely raises them here to give this Court an opportunity to reexamine its previous holding, and, if this court declines to do so, for purposes of preserving the issues for later review by a federal court. *See Engle v. Isaac,* 456 U.S. 107 (1982)." These issues are:

X. "The trial court erred in its instruction to the jury that malice and unlawfulness are implied by law from the intentional shooting with a deadly weapon contrary to law, constitutes an unconstitutional conclusive presumption on an element of the offense, impermissibly and unconstitutionally relieve the State of the burden of proving all elements of the offense and places the burden on the defendant to disprove an element of the offense and is unconstitutionally irrational, thereby depriving the defendant of his right to trial by jury, his right to have the State prove every element beyond a reasonable doubt and his right to due process of law."

*See State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* --- U.S. ---, 74 L.Ed. 2d 1031 (1983).

XI. "The imposition of a death sentence by a jury drawn from a venire from which potential jurors were questioned about their scruples against capital punishment deprive this defendant of his right to life without due process of law and his right to trial by jury."

*See State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983).

XII. "G.S. § 15A-2000(e)(9), that the murder was especially heinous, atrocious or cruel, is unconstitutionally vague on its face, and vague and overbroad as construed and applied in North Carolina."

*See Id.*

XIII. "The court erred in failing to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances substantially outweighed the mitigating circumstances sufficient to call for the death penalty, or the court erred in instructing the jury that it must return a verdict of death if it finds that the aggravating outweighed the mitigating circumstances, thereby lowering the State's burden of proof violating G.S. § 15A-2000(b)(3) and denying the defendant his right to be free from cruel and unusual punishment and due process of law as guaranteed by the eighth and fourteenth amendments to the United States Constitution and Article I, §§ 19, 27 and 35 of the North Carolina Constitution."

*See State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* --- U.S. ---, 78 L.Ed. 2d 173 (1983).

XIV. "The court erred in failing to instruct the jury during the penalty phase that if it was deadlocked a life sentence would be imposed."

*See State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982).

XV. "The court erred in failing to instruct the jury that the State had the burden of proving the nonexistence of each mitigating circumstance beyond a reasonable doubt and in placing

the burden on the defendant to prove each mitigating circumstance by a preponderance of the evidence."

*See State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304.

XVI. "The North Carolina Death Penalty Statute, G.S. § 15A-2000, and consequently the verdict of death in this case, unconstitutional, imposed in a discriminatory manner and involves subjective discretion, all in violation of the eighth and fourteenth amendments to the United States Constitution and Article I, §§ 19 and 27 of the North Carolina Constitution."

*See State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, --- U.S. ---, 74 L.Ed. 2d 622 (1982), *reh'g denied*, --- U.S. ---, 74 L.Ed. 2d 1031 (1983).

XVII. "The North Carolina capital murder scheme is unconstitutional under *Furman v. Georgia*, in that it permits subjective discretion and discrimination in imposing the death penalty, thereby depriving the defendant of his right to equal protection, due process of law and freedom from cruel and unusual punishment as guaranteed by the eighth and fourteenth amendments to the United States Constitution and Article I, §§ 19 and 27 of the North Carolina Constitution."

*See State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304.

XVIII. "The court erred in failing to instruct the jury on the manner in which they were to determine the existence or non-existence of the specific mitigating circumstances submitted to it, thereby depriving the defendant of his right to a guided decision by the jury, his right to be free from arbitrariness, his right to be free from cruel and unusual punishment and his right to due process of law as guaranteed by the eighth and fourteenth amendments to the United States Constitution and Article I, §§ 19, 27 and 35 of the North Carolina Constitution."

*See Id.*

XIX. "G.S. § 15A-2000(e)(9), that the murder was especially heinous, atrocious or cruel, unconstitutionally vague under the due process clause of the fourteenth amendment."

*See Id.*

State v. Moose

We appreciate defendant's candor. We have carefully re-viewed the arguments set forth in defendant's brief and find no fact or circumstance that would remove this case from the con-text in which the issues were discussed in previous cases. Fur-thermore, we have reviewed in detail our previous holdings on these issues, together with our reasoning in support thereof and decline to accept defendant's invitation to alter our position on any of the issues he now raises. Therefore, under the authority of the above cited cases, we find no error in defendant's assignments of error X through XIX.

Our review of the transcript indicates that defendant re-ceived the benefit of able and aggressive representation at trial before an able and thorough trial judge. His representation on ap-peal was equally competent.

In the guilt phase we find no error. The case is remanded to the Superior Court, Burke County, for resentencing.

Guilt Phase—no error.

Remanded for resentencing.

Justice MARTIN dissenting in part.

I concur in the guilt-innocence portion of the majority opinion but respectfully dissent from the remanding of the case for a new sentencing hearing. The majority finds the evidence insufficient to submit the issue to the jury of whether the capital crime was especially heinous, atrocious, or cruel. In this finding I cannot con-cur. I do concur in that portion of the majority opinion concerning whether the shotgun in this case was a weapon within the mean-ing of N.C.G.S. 15A-2000(e)(10).

This blatant murder in cold blood of a black man by this white defendant was racially motivated. A racially motivated murder evidences abnormal brutality and depravity not found in other murders. It is especially heinous, atrocious, or cruel. *State v. Stanley*, 310 N.C. 332, 312 S.E. 393 (1984).

The majority concedes that for the purpose of evaluating the prosecution's jury argument, the evidence supports a finding that the murder was racially motivated. The deceased, Ransom Con-

nelly, was a sixty-two-year-old black man driving his car through a white community in the nighttime. He was accompanied by another black man, the witness Phillip Kincaid. When defendant and his women friends, Lynn Whisnant and Carolyn Bradshaw, left the American Legion Hut, they intended to go to Morganton. However, after following Connelly and Kincaid on Zion Hill Road for 1.3 miles, defendant changed his mind. Even though Lynn asked him to turn right on highway 64-70 toward Morganton, defendant turned left and continued to follow his intended victims. All during this travel, defendant had repeatedly honked the car horn, followed Connelly's Pontiac car very closely, and bumped the rear of the car at least twice.

The testimony of Ronnie Bowen supports a finding that defendant murdered Connelly for racial reasons. Bowen was in jail with defendant for about two months after the murder and before the trial. He testified that he talked with defendant several times about defendant's case and:

Q. State whether or not you told him what you were charged with and if he told you about things he was changed [sic] with.

A. Yes sir, I told him I was charged with forgery and he was in there for shooting a nigger, is what he told me. . . . He told me that he had followed a dude, that he followed a nigger into, down the road into a parking lot drug store and pulled up beside of him, that he shot the man with a shotgun out of the window, was rolled down on the truck. . . . Yes sir, he said something about it wasn't on his conscience and that he had killed the nigger, but since he was in jail he regreted [sic] it, but that it didn't bother him, though.

. . . .

Q. By what names did he refer to the person that he told you that he had shot; what did he call that person?

A. Old man. Nigger; most of all nigger.

. . . .

Q. And did you tell me in that statement the names, or three different names that he referred to the dead man by? What he called the dead man.

A. Nigger. Old man and damn nigger. . . . [H]e told me that he did kill the damn nigger. . . .

. . . .

Q. Has he ever said that he was sorry that he shot the man?

A. Naw, he ain't never said that. He was sorry. He said that he wished it hadn't happened, but he never said that he was sorry.

This testimony as to what the defendant said evidences on his part a hatred for black people, a feeling of his superiority to them, and a cruel indifference to their fate. He was not sorry that he murdered the black man, it was not on his conscience. He only regretted being in jail. There is no other cause for this murder except defendant's racist attitude toward black people in general and toward Ransom Connelly in particular. Such evidence indicates abnormal brutality and depravity in the commission of the capital crime and is sufficient to submit the issue of especially heinous, atrocious, or cruel to the jury.

In analyzing this assignment of error, the majority only discusses the evidence that defendant stalked the deceased prior to the killing, thereby causing psychological torture to him. Contrary to the majority, I also find the evidence sufficient on this theory to submit the issue to the jury. Although the surviving witness failed to testify that Ransom Connelly was in panic because of the conduct of defendant in following Connelly's car, the evidence is sufficient to support a finding by the jury that Connelly suffered psychological torture during this period of time. When defendant failed to turn right on U.S. 64 toward Morganton as he had planned to do, it demonstrated an intent on his part to further inflict psychological torture on Connelly. The most potent evidence supporting this theory is that of the defendant ordering one of the women to hand him the shotgun, directing that the window be rolled down on the passenger side of his pickup truck, and coolly pointing the shotgun at Ransom Connelly's head for a period of five seconds before blowing him away. Five seconds is a short time in most circumstances, but when looking into the muzzle of a shotgun, it can be as an eternity. Ransom Connelly's remarks during the drive and as he faced the shotgun manifest

the mental torture he was suffering. He said he wished they would go ahead and pass and leave us alone; maybe we could make it on to Fender's store; we will be safe if we can get to Fender's; I'll just pull in here (at the Drexel Discount Drugstore) and maybe whoever it is will go on by. Finally, as the gun was levelled at his head, Connelly said, "Oh God, what are they going to do?" The majority characterizes the last statement as being one of incredulity. I find it to be a despairing prayer. Just as the hunter stalks his frightened and cornered prey, defendant stalked Connelly for the kill.

Further, the conduct of defendant after the murder, which I will not repeat, also supports a finding of depravity on the part of defendant within the holding of *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983).

The majority correctly states the rule to be applied in determining the sufficiency of the evidence to submit an aggravating circumstance to the jury. Upon applying the rule to the evidence in this case, I find it sufficient to support the issue on the theories that (1) defendant stalked his victim, causing him to suffer psychological torture; (2) the conduct of defendant was abnormally depraved under *Oliver*; and (3) the capital crime was a racially motivated murder. The evidence was sufficient to submit the aggravating circumstance of especially heinous, atrocious, or cruel to the jury for its determination.

I am authorized to state that Justices COPELAND and MITCHELL join in this dissenting opinion.