STATE OF NORTH CAROLINA v. BILLY JOE CHAPMAN

No. 69

(Filed 7 March 1978)

1. Criminal Law § 73.4— victim's statement—spontaneous declaration—res gestae

In this prosecution for felonious assault, the victim's testimony that he had told his wife and his neighbor, "That's Bill Chapman. He's going to kill us," was competent both as a spontaneous declaration and as a part of the *res gestae*.

2. Criminal Law § 169.3— admission of testimony—error cured by similar testimony admitted without objection

In this prosecution for felonious assault, any error in the admission of the victim's testimony that defendant's wife told him defendant was "on the way up here to kill you" was cured when another witness thereafter, without objection, repeated the testimony *ipsissimis verbis*.

3. Criminal Law § 73.1— exclusion of hearsay—no effect on other rulings permitting hearsay

The trial court's proper exclusion of incompetent hearsay upon the State's objection did not render prejudicial the harmless error of other rulings permitting the victim to repeat hearsay statements made by his wife.

**4. Criminal Law §§ 99.4, 162.7— failure to rule on objections—harmless error**

The trial judge's failure to rule on six of the objections made by defendant during the trial was not only error but was also an abdication of the judicial function. However, such error was harmless where the judge's conduct of the trial and his various rulings did not amount singly or in combination to an expression of opinion as to defendant's guilt, and there is no possibility that the judge's failure to rule on the objections influenced the verdict.

**5. Criminal Law § 169.6— refusal to permit excluded testimony to be placed in record—harmless error**

Ordinarily, a counsel should be allowed to insert in the record the answer to a question to which objection has been sustained. However, where the witness has already answered the question sufficiently to demonstrate the immateriality of the inquiry, the judge's refusal to allow the preservation of the answer will not be held prejudicial error.

**6. Criminal Law § 169.6— refusal to permit excluded testimony to be placed in record**

A judge should be loath to deny an attorney his right to have the record show the answer a witness would have made when an objection to the question is sustained since, in refusing such a request, the judge incurs the risk (1) that the Appellate Division may not concur in his judgment that the answer would have been immaterial or was already sufficiently disclosed by the record, and (2) that he may leave with the bench and bar the impression that he acted arbitrarily.

**7. Criminal Law § 86.5— cross-examination of defendant—prior acts of misconduct**

It was not error for the private prosecutor to ask defendant on cross-examination (1) whether he had stolen some angle irons which he admitted had come from his employer's premises but contended it was immaterial that he didn't pay for them and (2) whether, after having had trouble with some blacks at a beer joint, he had gone home, procured his gun, and come back for them.

**8. Criminal Law § 85.2— cross-examination of character witnesses—specific acts of misconduct**

In this prosecution for felonious assault, the trial court erred in permitting the prosecutor to ask defendant's character witnesses if they were aware that defendant on another occasion "got his gun and went after some black people in Charlotte," since a character witness may not be cross-examined as to specific acts of misconduct by defendant. However, such error was harmless where defendant stands guilty of felonious assault by his own testimony at the trial.

**9. Criminal Law § 128.1— when mistrial is appropriate**

A mistrial is appropriate only for serious improprieties which render impossible a fair and impartial verdict under the law.

**10. Criminal Law § 100— private prosecutor—duty of prosecutor to remain in charge of case**

It is a permissible practice for private prosecution, with the consent of the district attorney and the court, to assist the State in a prosecution, but in the absence of special circumstances, the law contemplates and public policy requires that the district attorney shall remain in charge of the prosecution.

ON defendant's petition for discretionary review of the unpublished decision of the Court of Appeals, filed 7 April 1976, which upheld defendant's trial before *Kirby, J.,* at the 17 February 1975 Session of GASTON Superior Court. The case was docketed and argued as Case No. 63 in the Fall Term 1976.

Defendant appeals his conviction of "assault with a deadly weapon with intent to kill inflicting serious injury," a violation of G.S. 14-32, and the judgment that he "be imprisoned for the term of not less than one year nor more than ten years." In its judgment the court recommended work-release for defendant.

The prosecuting witness, Robert J. Mauney, and the defendant, Billy Joe Chapman, are related by marriage in that Mrs. Mauney is Mrs. Chapman's aunt. Mauney lived in Stanley; defendant, about six miles away in Mount Holly. In 1967 the two men together bought a lot on Lake Norman, and each put a "vacation" mobile home on it. Thereafter relations between the two friends deteriorated. After several acrimonious incidents, in the retelling of which each accused the other of threatening his life, Chapman sold his interest in the lot to Mauney in February 1973. At that time defendant told Mrs. Mauney he "never wanted to hear tell of [Mauney], see him, or nothing else—no more"; that he "was through with him." The two men did not speak directly to one another again. Precarious communications, however, were maintained between the two families through Mrs. Lula Robinson, Mrs. Mauney's sister. At the time of the trial defendant was 43 years old.

On 13 June 1974, at Mrs. Mauney's request, Mrs. Robinson called Mrs. Chapman and asked her to have her husband return to Mauney a pair of "weight-lifting shoes." Mauney testified that several years before he had lent the shoes to defendant's son, Michael. (At the time of the trial Michael was 21 years old.) Defendant, however, testified that Mauney had given the shoes to Michael on his birthday five or six years earlier. When Mrs. Chap-

man informed defendant that "Mauney wanted the weight-lifting shoes back," he interpreted the request as a calculated harassment and was enraged by it. In pertinent part, defendant's version of his subsequent conduct, as detailed on his direct examination, is quoted below:

"As a result of talking to my wife [at supper], I pushed my plate aside, went into the bedroom. I had a .38 revolver in there. . . . My state of mind was to get him [Mauney] off my back to quit bugging me. I was angry. I was fairly angry. I'd have to be to do what I done. . . . I knew Robert Mauney carried a gun. . . . He always had the gun on him.

"My wife came in there and tried to stop me, and I remember knocking her over on the bed and all, to get her out of my way. I went and got in my truck. I proceeded to his home. When I saw him . . . he was on about the third or fourth step from the bottom [of his front porch] . . . leaning his arm over the handrail. When I stopped, I come out and I was firing at his knees down. I said, 'I want to just get you off my back. I've had enough of you. I thought we had had this over with.' I fired six shots is all I had. . . . Mrs. Zoe Mauney . . . was up on top of the porch, hollering . . . and [Mauney] jumped over the rail. My state of mind was to get him off my back. I had had enough of him. I thought enough in life was enough. . . . He jumped over the banister and came back firing while I was still firing. . . . He was behind the steps and all then, and I had a couple more shots, and I come out with those; and I pulled off just as soon as I got through with the six shots. He shot at me six times. My truck was not hit in any way. I went home. . . ."

Defendant testified on cross-examination that it was 10 minutes from the time his wife told him about the conversation with Mrs. Robinson that he arrived at the Mauney residence in Stanley. Mauney's request for the shoes made him "fighting mad," and he got his gun, a .38 snub-nose Smith & Wesson with a six-inch barrel. His wife, he stated, was hanging on him and pleading, "don't go out there and get in trouble." Notwithstanding, he "pushed her off" and drove the five or six miles to the Mauney residence with the pistol on the seat beside him. He further said: "I drove around the speed limit and I had time to think and reflect all this time about what I had planned to do when I got there. It took me 10 minutes. . . . When I pulled up . . . I took

my gun and stuck it out of the window in my right hand and started shooting. . . . I did not intend to kill him. I fired at him. . . . I fired at Mr. Mauney. I was shooting at Mr. Mauney. I meant to hit him below the knees, if I could. I just wanted him off my back. . . . When I approach a dangerous man, I approach him dangerous. Yes, sir, I'm proud of what I did. And when I went home the gun was empty. I know now that Mike came right behind my wife in another car. I was angry. I stayed angry. These bullets were .38, were special oversized bullets. They carry a big load of lead."

On redirect examination defendant said he had been in the United States Marine Corps for four years and that he was a sharpshooter. He also repeated that he "was plenty angry" when he arrived at the Mauney residence.

Mauney, aged 50, testified that bullets or fragments of bullets from defendant's gun struck him in the left side of his face, left hand, and right knee. Dr. Wilson Lynch, who treated Mauney for these wounds, said he found four small fragments in him but not a whole bullet. He described Mauney's wounds as "superficial puncture wounds" or "small points on the skin with some swelling underneath." The knee, which had "a fairly marked entry and exit wound" contained a fragment. This was the deepest wound. Two minute fragments remain in his face but there are now no scars to show the penetration. "The fragment remaining in his hand is probably half of a .38 caliber." It has become "scarred to a tendon" and the result is a limitation of motion in his left hand.

Defendant's wife, Mrs. Jean Staton Chapman, testified that when she told her husband that Mauney "wants his weight shoes that he gave Michael" he became emotionally upset and "looked like he was wild." She believed he was not "in contact with reality." Failing in efforts to keep defendant at home, she called her son Michael and told him to come at once; that she believed his father had gone crazy and was headed toward Stanley with a pistol. She then set out in her car hoping to reach the Mauney residence before he did; she arrived just in time to witness the shooting. After defendant had driven away Mauney approached her car and she inquired if he had been hurt. He said, "No, I'm not, but I got him." That statement "threw all over" her, and she told Mauney that but for his conduct they "wouldn't have all this

trouble" and she believed "he had run Bill crazy." She then left to find her husband.

Other facts necessary to the decision in this case will appear in the opinion.

*Rufus L. Edmisten, Attorney General, William A. Raney, Jr., Assistant Attorney General, and Jo Anne Sanford Routh, Associate Attorney, for the State.*

*Childers and Fowler and Roberts, Caldwell and Planer for defendant appellant.*

SHARP, Chief Justice.

Defendant brings to this Court nine of his original 15 assignments of error, to wit, Nos. 2-5 and 10-14. After a careful consideration of the record and briefs we have concluded that it would be a labor in vain to discuss in detail all of these assignments, for none discloses prejudicial error. The majority, therefore, will receive summary treatment.

The background of assignment No. 2 is this:

On direct examination Mauney testified that on the evening of 13 June 1974, while he, his wife and a neighbor, Mrs. W. S. Hyde, were sitting on the front porch and steps of his residence, defendant stopped his truck in front of the house and began shooting. When asked, "Could you describe how you saw him shoot?" Mauney replied, "He put the weapon out beside the rear view mirror, and began shooting, and I told my wife and my neighbor, I said, that's Bill Chapman. He's going to kill us. Get in the house."

[1] Defendant's motion to strike Mauney's entire answer was denied. Defendant now argues that the statement, "That's Bill Chapman. He's going to kill us," was unresponsive to the question and constituted an impermissible expression of opinion by the witness on a material fact. This assignment is devoid of merit for the following reasons: (1) Counsel's motion to strike was general. He did not single out the allegedly objectionable portion. *State v. Pope,* 287 N.C. 505, 215 S.E. 2d 139 (1975). (2) After Mauney had testified, Mrs. Hyde took the stand and, without objection, gave essentially the same account of the shooting, repeating almost verbatim Mauney's sponstaneous declaration of defendant's in-

tent. *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974). (3) The challenged statement was admissible both as a spontaneous declaration and as a part of the *res gestae*. *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976); *State v. Feaganes*, 272 N.C. 246, 158 S.E. 2d 89 (1967).

[2]  Assignment No. 4 parallels No. 2. Mauney was allowed to testify over objection that after defendant had left the scene of the shooting he saw Mrs. Chapman sitting in her car. She called to him, "Uncle Robert, have you seen Bill? He's mad as hell and on his way up here to kill you." Mauney's response was, "He's just tried it, but he didn't get it done."

The trial judge denied defendant's motion to strike the statement "he's on the way up here to kill you." If error was committed by the admission of Mrs. Chapman's statement to Mauney, it was cured shortly thereafter when Mrs. W. S. Hyde, without objection, repeated Mauney's testimony as quoted above *ipsissimis verbis*. *State v. Greene, supra*; 4 Strong's North Carolina Index 3d, *Criminal Law* § 169.3.

Assignment No. 5 challenges the admission of Mauney's testimony that after the shooting his wife said to him, "Call the Doctor." That this statement is hearsay cannot be doubted, but it is also clear that its admission could not have possibly influenced the jury's verdict. Assignment No. 11 is equally trifling. Mr. W. S. Hyde, a witness for the State, testified that before Mrs. Chapman left the scene of the shooting he heard Mrs. Mauney say to her, "Honey, you're wrong about that." From the record, what Mrs. Mauney's niece was "wrong about" is so obscure it could not be held prejudicial error.

[3]  In assignment No. 13 defendant asserts that the trial judge, after having permitted the prosecuting witness to repeat hearsay statements made by his wife, erred in sustaining the State's objection to questions intended to elicit similar hearsay from defendant. The proffered testimony related to statements Mrs. Mauney made to defendant at Lake Norman in October 1972 when she came to warn the Chapmans "to go out on the pier" because Mauney "was mad and had his pistol." Manifestly, the judge's ruling was correct, and his exclusion of incompetent hearsay upon the State's objection would not render prejudicial the harmless error of other rulings. The judge was not required to

balance the scales with an equal number of hearsay statements made by the wives of the prosecuting witness and the defendant.

[4]  Defendant's assignment of error No. 3 relates to the failure of the trial judge to rule on six of the objections which defendant made during the trial. Defendant correctly asserts that "the parties are entitled, as a matter of right, to have the judge definitely decide all questions relating to the admissibility of evidence, and to admit or reject it accordingly." *State v. Whitener*, 191 N.C. 659, 662, 132 S.E. 603, 604 (1926). Indubitably, there are times when this obligation will appear onerous to a trial judge exasperated by too many seemingly meritless objections. Nonetheless, "counsel is entitled to an explicit ruling on each objection interposed." *State v. Staley*, 292 N.C. 160, 167, 232 S.E. 2d 680, 685 (1977); *State v. Lynch*, 279 N.C. 1, 181 S.E. 2d 561 (1971).

A trial judge's failure to rule upon an objection is not only error; it is an abdication of the judicial function. In the context of this case, however, we are convinced that the error was harmless. Defendant's objections had little, if any, merit. True, in both *Staley* and *Lynch, supra,* the Court reversed the defendants' convictions despite the lack of merit in the ignored objections. However, in both of those cases the trial judge's attitude and related actions, combined with the sheer number of unanswered objections, raised the reasonable inference that he had communicated to the jury an opinion that defendant was guilty as charged. By contrast, in this case, the judge's conduct of the trial and his various rulings, although not always free from error, did not amount singly or in combination, to an expression of opinion as to defendant's guilt. We perceive no possibility that the judge's failure to rule on the six objections influenced the verdict.

Assignment 10 is that the trial judge erred in refusing to allow defendant to exercise his right to put into the record the response which the prosecuting witness Mauney would have made to a question on cross-examination had he been allowed to answer.

Mauney testified on cross-examination that his pistol was loaded with "hollow tip" ammunition and that he did not have "the least idea what the effect of a hollow tip bullet is"; that he bought these hollow tip bullets from a friend. At the close of this cross-examination, counsel for defendant said, "I want to go back

to one question. Why is it you put hollow tip bullets in your gun?" The State's objection was sustained, and the court refused to permit Mauney to answer for the record. Defendant's assignment No. 10 specifies this refusal as prejudicial error.

[5] Ordinarily, counsel should be allowed to insert in the record the answer to a question to which objection has been sustained. Indeed, an exception to the action of the trial court will be worthless on appeal unless the answer is thus preserved. 1 Stansbury's N.C. Evidence § 26 (Brandis rev. 1973). We also note that the Rules of Civil Procedure specifically require the judge to preserve the offer of evidence in the record in a civil case. G.S. § 1A-1, Rule 43(c). However, where the witness has already answered the question sufficiently to demonstrate the immateriality of the inquiry, the judge's refusal to allow the preservation of the answer will not be held prejudicial error. *State v. Stanfield*, 292 N.C. 357, 233 S.E. 2d 574 (1977); *State v. McPherson*, 276 N.C. 482, 172 S.E. 2d 50 (1970). *See State v. Willis*, 285 N.C. 195, 204 S.E. 2d 33 (1974); *Highway Commission v. Pearce*, 261 N.C. 760, 136 S.E. 2d 71 (1964). In the case under consideration, the witness had already testified that he did not know the effect of hollow tip bullets; specifically, he was unaware of their greater destructiveness on striking human tissues. Moreover, whatever his answer might have been, it would have been immaterial. The witness was the victim of a shooting; not the assailant. There is not a shred of evidence to suggest that Chapman acted out of self-defense. All the evidence tends to show that Chapman's attack upon Mauney was totally without justification.

[6] Notwithstanding our ruling here, we are constrained to say that we regard the trial judge's refusal to allow counsel to complete the record as a regrettable judicial mistake. A judge should be loath to deny an attorney his right to have the record show the answer a witness would have made when an objection to the question is sustained. In refusing such a request the judge incurs the risk (1) that the Appellate Division may not concur in his judgment that the answer would have been immaterial or was already sufficiently disclosed by the record, and (2) that he may leave with the bench and bar the impression that he acted arbitrarily.

[7] Assignment No. 12 asserts that the trial judge erred in permitting the private prosecutor to ask two questions concerning

"alleged prior criminal acts of the defendant." These questions were directed to defendant on cross-examination for the purpose of impeaching his credibility as a witness. As long as such questions are asked in good faith they are permissible. *E.g., State v. Foster*, 293 N.C. 674, 239 S.E. 2d 449 (1977); *State v. Williams*, 292 N.C. 391, 233 S.E. 2d 507 (1977); *State v. Foster*, 284 N.C. 259, 200 S.E. 2d 782 (1973). Accordingly, it was not error for the private prosecutor to ask defendant on cross-examination if he had stolen some angle irons which he admitted had come from his employer's premises but contended it was "immaterial that he didn't pay for them."

Likewise, it was not error for the prosecution to have asked defendant on cross-examination if, after having had trouble "with some blacks at a beer joint," he had gone home, procured his gun, and come back for them. Defendant denied that he had done anything of the sort and explained that "quite a few years ago," after he had emerged from "an eating establishment," his car "was ganged by a bunch of colored people." Seeing "no other way out of it," he reached into his glove compartment as if to get a pistol and said, "All right, come on." "And that," he said, "is all there was to it. Mr. Mauney don't know what he's talking about."

[8] The private prosecutor had previously addressed questions pertaining to defendant's alleged "trouble with some blacks" to two witnesses who had testified that defendant's general character and reputation in his community was good. On cross-examination these witnesses were asked if they were aware that defendant "got his gun and went after some black people in Charlotte." Each said he was unaware that such an incident had occurred. Notwithstanding, these questions were improper and defendant's objections to them should have been sustained. "When a defendant introduces evidence of his good character, the State has the right to introduce evidence of his bad character, but it is error to permit the State to cross-examine the character witnesses as to particular acts of misconduct on the part of the defendant. Neither is it permissible for the State to introduce evidence of such misconduct. The general rule is that a character witness may be cross-examined as to the general reputation of the defendant as to particular vices or virtues, but not as to specific acts of misconduct." *State v. Green*, 238 N.C. 257, 258, 77 S.E. 2d 614, 615 (1953). This rule is well established in our

jurisdiction. *State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954); *State v. Church*, 229 N.C. 718, 51 S.E. 2d 345 (1948); *Barton v. Morphes*, 13 N.C. 520 (2 Dev. 1830).

The error in allowing the private prosecutor to question defendant's character witnesses about their knowledge of a specific act of misconduct by defendant, like the other errors in this trial, was harmless. This conclusion is irrefutably established as an actual fact since defendant stands guilty by his own testimony at trial. He testified that, infuriated by a request from Mauney that he return a birthday present Mauney had given his son, he got his .38 snub-nose pistol with a six-inch barrel, threw off his wife who was trying to restrain him, and drove to the Mauney home about six miles away; that during the 10 minute drive he had time to think about what he intended to do. His purpose, he said, was to get Mauney off his back; he "had had enough of him" and "enough in life is enough." Once at Mauney's, he stuck his gun out the window of his truck and fired six shots—all he had. He said, "I was shooting at Mr. Mauney. I meant to hit him below the knees, if I could. I just wanted him off my back. . . . Yes, sir, I'm proud of what I did."

In the light of defendant's admissions, the damage to the credibility of defendant's character witnesses or the damage to defendant's own character caused by the prosecutor's improper questions (were we to assume any damage was done) dwindles to insignificance. Had myriads of witnesses of unimpeachable credibility vouched for defendant's reputation and good character, any reasonable jury would still have convicted him on his own testimony.

[9] Although the test for harmless error has been variously stated (*see* 4 Strong's N.C. Index 3d, *Criminal Law* § 167), the applied rule has always been that so long as there is no reasonable possibility that a different verdict would be reached at a new and error free trial then the error is harmless, and defendant is not entitled to a new trial. *E.g., State v. Turner*, 268 N.C. 225, 150 S.E. 2d 406 (1966). "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, 605 (1953). In this case the errors individually do not require reversal; collectively they did not compel the granting of a mistrial. A mistrial is appropriate only for serious improprieties which render impossible a fair and impartial

verdict under the law. *State v. Crocker*, 239 N.C. 446, 450, 80 S.E. 2d 243, 246 (1954). We therefore overrule defendant's final assignment of error, No. 14, that the trial judge erred in not declaring a mistrial because of the "prejudiced and inflammatory questions posed by the special prosecutor."

[10] In conclusion we note that when this case was called for trial an assistant solicitor informed the court that "Mr. Cooke appears with the State as a private prosecution on behalf of Mr. Mauney. By and with the permission of the court, we request that Mr. Cooke be allowed to examine the jury." Permission was granted and thereafter the record discloses no further participation in the case by the solicitor or his assistants. The record does show, however, that after verdict the court conferred with counsel for defendant and with Mr. Cooke with reference to punishment and that later, in open court, both made "extensive statements" on that subject. It is, of course, a permissible practice of long standing for private prosecution, with the consent of the solicitor and the court, to assist the State in a prosecution. *State v. Best*, 280 N.C. 413, 186 S.E. 2d 1 (1972). In the absence of special circumstances, however, the law contemplates that the solicitor shall remain in charge of the prosecution, and public policy requires that he do so.

For the reasons heretofore stated, in the trial below we find no error.

No error.