An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-399

NORTH CAROLINA COURT OF APPEALS

Filed: 18 February 2014

STATE OF NORTH CAROLINA

|                        |                     |
|------------------------|---------------------|
| v.                     | Mecklenburg County  |
|                        | No. 10 CRS 209039   |
| JEREME LUKOSKIE,       |                     |
|    Defendant. |               |

Appeal by defendant from judgment entered 21 September 2012 by Judge Linwood O. Foust in Mecklenburg County Superior Court. Heard in the Court of Appeals 26 September 2013.

> *Roy Cooper, Attorney General, by Kathryne E. Hathcock, Assistant Attorney General, for the State.*

> *Arnold & Smith, PLLC, by J. Bradley Smith and Laura M. Cobb, for defendant-appellant.*

DAVIS, Judge.

Jereme D. Lukoskie ("Defendant") appeals from a judgment convicting him of driving while impaired ("DWI"). On appeal, he contends that the trial court erroneously (1) denied his pre-trial motion to suppress all evidence obtained while he was stopped at a checkpoint; and (2) refused to allow him the opportunity to make an offer of proof at trial. After careful

review, we affirm the trial court's denial of Defendant's motion to suppress and hold that the trial court did not commit prejudicial error in limiting his ability to make an offer of proof.

## Factual Background

The State presented evidence at trial tending to establish the following facts: On 26 February 2010, the Charlotte-Mecklenburg Police Department ("CMPD") established an impaired driving checkpoint at the 6000 block of Brookshire Boulevard supervised by Sergeant David Sloan ("Sergeant Sloan"). Officer Matthew Pressley ("Officer Pressley") manned the outbound lanes of Brookshire Boulevard where he observed Defendant enter the checkpoint driving a Volkswagen Passat sedan. Officer Pressley approached the vehicle and engaged in conversation with Defendant, informing Defendant that he was at a DWI checkpoint. Officer Pressley asked Defendant "how much, if anything, he had to drink." Defendant responded that he had consumed "a few drinks two hours earlier."

Officer Pressley then directed Defendant to exit the vehicle and perform a series of field sobriety tests. Defendant failed to perform any of the tests to Officer Pressley's satisfaction. Based on Defendant's slurred speech, red and

glassy eyes, the odor of alcohol on his breath, and Defendant's poor performance on the field sobriety tests, Officer Pressley formed the opinion that Defendant was appreciably impaired by the consumption of alcohol.

Defendant was placed under arrest for impaired driving and taken to a nearby blood alcohol testing mobile unit for a breath test. Defendant registered a .16 blood alcohol concentration level. Defendant was then charged with driving while impaired in violation of N.C. Gen. Stat. § 20-138.1.

On 13 July 2010, a trial was held in Mecklenburg County District Court. Defendant was convicted of DWI and placed on unsupervised probation for one year. Defendant appealed to superior court.

On 6 October 2010, Defendant filed a motion to suppress all evidence resulting from the checkpoint, arguing that the checkpoint failed to meet constitutional standards. The motion was denied.

A jury trial was held beginning on 19 September 2012. The jury found Defendant guilty of DWI. The trial court sentenced Defendant to 30 days imprisonment but suspended the sentence and placed him on unsupervised probation for 12 months. Defendant gave timely notice of appeal.

## Analysis

### I. Denial of Motion To Suppress

The bulk of Defendant's appeal arises from his argument that the trial court erred in denying his motion to suppress. We conclude that his argument lacks merit.

Our review of a trial court's ruling on a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke,* 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Additionally, any findings of fact that are not specifically challenged by a party are "deemed to be supported by competent evidence and are binding on appeal." *State v. Roberson,* 163 N.C. App. 129, 132, 592 S.E.2d 733, 735-36 (2004). "The conclusions of law made from the findings of fact are reviewable *de novo*." *State v. Brown,* 199 N.C. App. 253, 256, 681 S.E.2d 460, 463 (2009).

### A. Sufficiency of Findings of Fact

The trial court made the following pertinent findings pursuant to Defendant's pre-trial motion to suppress evidence arising from the DWI checkpoint:

1.    From 11:00 pm Friday February 27th 2010 to 3:00 am Saturday February 28th, 2010 the Charlotte-Mecklenburg Police Department operated a DWI Checking Station on Brookshire Blvd., a public street in the area.

2.    The Checking Station was operated in accordance with a written plan (State's Exhibit #1) drafted by Sergeant David Sloan pursuant to, and in accordance with N.C.G.S. 20-16A. Sergeant Sloan briefed the officers working the checkpoint that night as to how to conduct the Checking Station in accordance with the plan.

3.    The plan provided for the location and time of the checkpoint. Sergeant Sloan has been supervising DWI checking stations for several years. He has been working major traffic units for two decades. Sergeant Sloan personally had made several DWI arrests in the area near Brookshire Blvd. Sergeant Sloan testified that the location of the checkpoint location was chosen based on traffic fatalities, prior DWI arrest within the area, and the presence of several bars in the area.

4.    The purpose of the checkpoint was to deter driving while impaired and related accidents through DWI detection and arrest. The area chosen is used twice a year by CMPD for checkpoint operations, either on Freedom Dr. or Brookshire Blvd. The checkpoints have yielded prior DWI arrest[s].

5.    The strategic plan set forth the appropriate notifications to the public including signs and markers and patrol cars with lights activated notifying the public of the checkpoint.

6.    The plan provided for each car to be

stopped and for officers to ask for a driver's license and to check their registration and to engage in conversation. If there were no issues with the license and no evidence of alcohol or drug consumption was present, motorists would be free to leave. Such a stop took 10-30 seconds. If alcohol was detected, the drivers were asked to step out of their vehicles and perform field sobriety tests.

7. Sergeant Sloan briefed all participating law enforcement officers of the specific instructions to which each officer was to adhere fifteen minutes before the checkpoint began. Sergeant Sloan was the only officer allowed to deviate from the plan. The plan did not cause a back up in traffic. Sergeant Sloan never had to deviate from the plan.

8. The Checking Station was administered in accordance with the plan.

9. The defendant was stopped at the Checking Station.

10. The defendant admitted several reports of arrest in the area of the checkpoint that did not indicate a large number of DWI arrest[s]; however, the [sic] Sergeant Sloan testified that the reports do not necessarily show the number of DWI arrest[s] in the area.

11. The reports were based on calls for service and incidents in the area; therefore, a DWI arrest may not be listed in the reports produced by the defense.

12. Area where the checkpoint was set up is a high traffic area. The purpose of the checkpoint was to detect DWI individuals and the checkpoint was not set up as a means for

stopping the public for some other purpose.

Based on its findings of fact, the trial court made the following conclusion of law:

> 1. The Court concludes that, the Checking Station was operated in accordance with the United States and North Carolina Constitutions and North Carolina law, and does not violate the 4th Amendment.

With regard to the trial court's findings of fact, Defendant only challenges findings 2, 3, 4, 10, 11, and 12. Thus, findings 1 and 5-9 are binding on appeal. *Roberson*, 163 N.C. App. at 132, 592 S.E.2d at 735-36.

Findings 2-4 address (1) the degree to which the checkpoint was operated in accordance with a written plan; (2) the rationale for the checkpoint location; and (3) the checkpoint's purpose. Defendant argues that these findings are not supported by competent evidence in that the checkpoint "lacked a lawful primary programmatic purpose."

We believe that findings 2-4 are supported by the testimony of both Officer Pressley and Sergeant Sloan, which adequately explained the purpose of the checkpoint and the manner in which it was implemented. Sergeant Sloan testified that the checkpoint occurred because "we have [had] numerous DWI arrests and fatalities that have occurred on Brookshire Boulevard." The

written plan for the checkpoint — State's Exhibit No. 1 — also stated that it was a "sobriety checking station" and that its purpose was to check for impaired driving. Sergeant Sloan testified that "approximately 15 minutes prior to the check-in station beginning we had a briefing . . . [to] make sure every officer is briefed on the plan and . . . [to] make sure they follow the procedures set forth in the plan." Therefore, we conclude that findings of fact 2-4 are supported by competent evidence.

Defendant next challenges findings 10 and 11, both of which address reports Defendant introduced into evidence outlining the number of accidents previously occurring in the vicinity of the checkpoint area and the relatively few DWI-related incidents listed therein.

At the suppression hearing, Sergeant Sloan testified that the report offered by the Defendant would not specifically reflect DWI-related offenses unless the call reporting the incident referred to it as being DWI-related: "The call for service comes in as a crash, the officer gets out, investigates it, and makes a DWI arrest based on that wreck, but it won't be generated as a DWI offense. It's generated as an accident."

Thus, Sergeant Sloan's testimony served as competent evidence to support findings 10 and 11.

Finally, Defendant asserts that finding 12 - which states, in pertinent part, "that the purpose of the checkpoint was to detect DWI individuals and the checkpoint was not set up as a means for stopping the public for some other purpose" - was not supported by competent evidence. He contends that the State bore the burden of demonstrating that the checkpoint was "undertaken for a lawful primary programmatic purpose" and the State failed to meet its burden by relying solely on the testimony of Officer Pressley and Sergeant Sloan.

At trial, the State offered as an exhibit the DWI checkpoint plan. Sergeant Sloan testified that this plan, which was followed by every officer participating in the checkpoint, clearly states that the programmatic purpose of the checking station was to check for sobriety. The plan expressly provides that "the sobriety checkpoint . . . will apprehend impaired drivers" and also contains a number of factors that were considered by the CMPD in determining whether the checking station would be successful. Those factors included: (1) the number of accidents in the area involving impaired drivers; (2) the number of bars and drinking establishments in the area; (3)

the number of DWI arrests made in the area; (4) the number of DWI arrests made on Friday nights; and (5) the number of DWI arrests made during these specific hours of the night. This Court has held that the State is permitted to establish the purpose of a checkpoint through the testimony of a participating officer. *State v. Burroughs,* 185 N.C. App. 496, 499-500, 648 S.E.2d 561, 565-66 (2007) ("Our Court has previously held that where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose.") Based on the testimony of Sergeant Sloan and Officer Pressley and the checkpoint plan itself, we conclude that the State presented competent evidence to support the trial court's finding that the sole purpose of the checkpoint was to detect persons who are driving while impaired.

**B. Constitutionality of Checkpoint**

Having established that findings of fact 2, 3, 4, 10, 11, and 12 were supported by competent evidence, we next determine whether the trial court's findings of fact support its conclusion of law that the checkpoint was operated within constitutional boundaries. The United States Supreme Court has

held that an impaired driving checkpoint is constitutional if vehicles are stopped according to a neutral, articulable standard. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 L.Ed.2d 412 (1990). N.C. Gen. Stat. § 20-16.3A governs the establishment, organization, and management of impaired driving checkpoints in North Carolina and sets forth the bases for stopping vehicles at such checkpoints.

> A law-enforcement agency may conduct checking stations to determine compliance with the provisions of this Chapter. If the agency is conducting a checking station for the purposes of determining compliance with this Chapter, it must:
>
> . . .
>
> (2) Designate in advance the pattern both for stopping vehicles and for requesting drivers that are stopped to produce drivers license, registration, or insurance information.
>
> (2a) Operate under a written policy that provides guidelines for the pattern, which need not be in writing. The policy may be either the agency's own policy, or if the agency does not have a written policy, it may be the policy of another law enforcement agency, and may include contingency provisions for altering either pattern if actual traffic conditions are different from those anticipated, but no individual officer may be given discretion as to which vehicle is stopped or, of the vehicles stopped, which driver is requested to produce drivers license, registration, or insurance information. If officers of a law

enforcement agency are operating under another agency's policy, it must be stated in writing.

(3) Advise the public that an authorized checking station is being operated by having, at a minimum, one law enforcement vehicle with its blue light in operation during the conducting of the checking station.

N.C. Gen. Stat. § 20-16.3A (2011).

"[P]olice officers effectuate a seizure when they stop a vehicle at a checkpoint. As with all seizures, checkpoints conform with the Fourth Amendment only if they are reasonable." *State v. Jarett*, 203 N.C. App. 675, 677, 692 S.E.2d 420, 423 (2010) (internal citations and quotation marks omitted).

When considering a challenge to a checkpoint, the reviewing court must undertake a two-part inquiry to determine whether the checkpoint meets constitutional requirements. First, the court must determine the primary programmatic purpose of the checkpoint . . . . Second, if a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint . . . [the court] must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances.

*Id.* (internal citations and quotation marks omitted).

## 1. Primary Programmatic Purpose

Defendant argues the trial court erred by "finding a legitimate programmatic purpose for the checkpoint where the

only evidence regarding this purpose consisted of two police officers' uncorroborated memories of incidents occurring in the area," instead of "reports, data, or empirical information."

We reject Defendant's argument on this issue because, as discussed above, competent evidence supported the trial court's finding that the checkpoint was conducted for the legitimate purpose of apprehending impaired drivers. *See Burroughs,* 185 N.C. App. at 498-503, 648 S.E.2d at 562-66 (holding that where defendant failed to offer evidence that stated purpose of vehicle checkpoint was façade for separate, unconstitutional purpose, trial court erred in excluding evidence obtained during checkpoint).

In reviewing the constitutionality of a checkpoint, the trial court is required, as an initial matter, to "'examine the available evidence to determine the purpose of the checkpoint program.'" *State v. Gabriel*, 192 N.C. App. 517, 521, 665 S.E.2d 581, 585 (2008) (quoting *State v. Rose*, 170 N.C. App. 284, 289, 612 S.E.2d 336, 339*, appeal dismissed and disc. review denied,* 359 N.C. 641, 617 S.E.2d 656 (2005)).

> Our Court has previously held that where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose. However, where

there is evidence in the record that could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose. In such cases, the trial court may not simply accept the State's invocation of a proper purpose, but instead must carr[y] out a close review of the scheme at issue. This type of searching inquiry is necessary to ensure that an illegal multi-purpose checkpoint [is not] made legal by the simple device of assigning the primary purpose to one objective instead of the other[.]

*State v. Veazey*, 191 N.C. App. 181, 187, 662 S.E.2d 683, 687-88 (2008) (internal citations and quotation marks omitted). "[W]hen a trooper's testimony varies concerning the primary purpose of the checkpoint, the trial court is required to make findings regarding the actual primary purpose of the checkpoint and . . . to reach a conclusion regarding whether this purpose was lawful." *Gabriel,* 192 N.C. App. at 521, 665 S.E.2d at 585 (internal citation and quotation marks omitted).

Here, as shown above, Officer Pressley's and Sergeant Sloan's testimony regarding the actual primary purpose of the checkpoint were consistent. Both officers testified that the checkpoint's primary purpose was for DWI detection. Their testimony was further corroborated by the actual DWI checkpoint plan — drafted pursuant to N.C. Gen. Stat. § 20-16.3A — which clearly states that the checkpoint was a "sobriety checking

station." Because there is no evidence in the record to contradict the State's proffered purpose for the checking station, we are satisfied that sufficient evidence existed to demonstrate a legitimate programmatic purpose for the checkpoint. See *Veazey,* 191 N.C. App. at 187, 662 S.E.2d at 687 ("[W]here there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose.").

While Defendant attempts to rely on *State v. Rose*, 170 N.C. App. 284, 612 S.E.2d 336 (2005), in support of his contention that the checkpoint lacked a valid programmatic purpose, his reliance is misplaced. In *Rose*, the trial court simply accepted, without comment, the field officers' label of the checkpoint as a license and registration checkpoint. This Court held that a trial court could not avoid the task of determining the primary programmatic purpose of a checkpoint simply by finding that a checkpoint had at least one lawful purpose. *Rose*, 170 N.C. App. at 290, 612 S.E.2d at 340. We further concluded that the trial court had failed to make necessary findings as to whether the checkpoint was appropriately tailored to meet a primary programmatic purpose. *Id.* at 293, 612 S.E.2d

at 341. For these reasons, we reversed the defendant's convictions and remanded for further findings of fact addressing whether the primary programmatic purpose was constitutionally permissible. *Id*. at 293, 612 S.E.2d at 337.

Defendant argues that *Rose* is analogous to the present case in that Sergeant Sloan did not take any reports, data, or empirical information into account when creating the plan for the checkpoint. Defendant claims that this case is, therefore, no different than *Rose*, in which there was no evidence of purpose offered other than that of the "individual officers acting at the scene." *Id.* at 290, 612 S.E.2d at 340.

However, in *Rose,* the court was faced with the issue of "spontaneous" checkpoints that were not prescribed by any written plan or at the direction of any authority other than the officers that decided to conduct the stop. *Id.* at 294, 612 S.E.2d at 342. Here, conversely, the checkpoint at issue was not spontaneous and was instead governed by a written plan drafted by Sergeant Sloan pursuant to N.C. Gen. Stat. § 20-16.3A. Both Sergeant Sloan and Officer Pressley testified that the primary purpose of the checkpoint was to check for impaired drivers and that the location was chosen because of traffic fatalities and prior DWI arrests within the area as well as the

existence of surrounding bars. Furthermore, nothing in N.C. Gen. Stat. § 20-16.3A requires officers to rely on empirical data in deciding where to establish a checkpoint.

**2. Reasonableness of Checkpoint**

Defendant also contends that the trial court made insufficient findings regarding the reasonableness of the checkpoint. Once a trial court determines that the primary programmatic purpose of a checkpoint is proper, it must then apply the three-prong inquiry set forth by the United States Supreme Court in *Brown v. Texas*, 443 U.S. 47, 61 L.Ed.2d 357 (1979), in order to determine whether the checkpoint is reasonable. *Jarrett*, 203 N.C. App. at 679, 692 S.E.2d at 424-25. "Under *Brown*, the trial court must consider [1] the gravity of the public concerns served by the seizure[;][2] the degree to which the seizure advances the public interest[;] and [3] the severity of the interference with individual liberty." *Id*. at 679, 692 S.E.2d at 425 (internal citations and quotation marks omitted).

The first factor under *Brown* "analyzes the importance of the purpose of the checkpoint. This factor is addressed by first identifying the primary programmatic purpose . . . and then assessing the importance of the particular stop to the

public." *Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342 (internal citation omitted).

Both the United States Supreme Court and the Supreme Court of North Carolina have determined that the desire to eliminate impaired driving is a matter of substantial public concern. *Sitz,* 496 U.S. at 455, 110 L.Ed.2d at 423 ("No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."); *see State v. Foreman*, 351 N.C. 627, 633, 527 S.E.2d 921, 924-25 (2000) ("Our state's interest in combating intoxicated drivers outweighs the minimal intrusion that an investigatory stop may impose upon a motorist under these circumstances.").

Under the second prong of *Brown*, the trial court must determine "whether '[t]he police appropriately tailored their checkpoint stops' to fit their primary purpose." *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690 (quoting *Illinois v. Lidster*, 540 U.S. 419, 427, 157 L.Ed.2d 843, 852 (2004)).

> Our Court has previously identified a number of non-exclusive factors that courts should consider when determining whether a checkpoint is appropriately tailored, including: whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or

> ending time; and whether police offered any reason why that particular time span was selected.

*Jarrett*, 203 N.C. App. at 680, 692 S.E.2d at 425.

Here, the checkpoint was not set up on a whim. Officer Sloan testified at the suppression hearing that the checkpoint plan was developed a week prior to the date on which the checkpoint occurred.

Sergeant Sloan also testified to the reason why the 6000 block of Brookshire Boulevard was chosen. He stated that this checkpoint is chosen "at least twice a year at the same location due to the high number of DWI arrests and wrecks out at that location." Sergeant Sloan also testified that each time a checkpoint has been established on Brookshire Boulevard, "we've netted more than double-digit DWI arrests."

Another key factor under the second prong of *Brown* is ascertaining whether or not the checkpoint had a predetermined starting or ending time and whether any reason is offered about why that particular time span was selected. Here, the checking station plan had a predetermined starting time of 11:00 p.m. on 26 February 2010 and an ending time of 3:00 a.m. on 27 February 2010. Furthermore, Officer Pressley testified that this time span was chosen

> [du]e to high incidents of DWIs in and around that area of Brookshire, in particular on Friday nights . . . [t]he large number of drinking establishments in and around that area . . . [and] [t]he fact that that roadway is a major thoroughfare from downtown traffic and all the drinking establishments that are there.

The third prong of *Brown* requires this Court to consider the severity of the interference with individual liberty resulting from the checkpoint. We have articulated a number of factors that are relevant in making this consideration, including

> the checkpoint's potential interference with legitimate traffic; whether police took steps to put drivers on notice of an approaching checkpoint; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern; whether drivers could see visible signs of the officers' authority; whether police operated the checkpoint pursuant to any oral or written guidelines; whether the officers were subject to any form of supervision; and whether the officers received permission from their supervising officer to conduct the checkpoint[.]

*Jarrett*, 203 N.C. App. at 681, 692 S.E.2d. at 425-26 (citation omitted). While all of these factors are relevant, a trial

court does not need to explicitly address each one of them in its findings. *Id.*

Here, Sergeant Sloan devised the checkpoint plan, which provided the written guidelines that were followed at the checkpoint, and personally supervised the checkpoint. The plan stated that "CMPD finds that the stopping of every vehicle, tempered with the contingency of allowing vehicles through . . . only if traffic is congested by the checkpoint to an unforeseen and unreasonable level, is an acceptable and reasonable number of vehicles to stop." The plan also limited the officers to asking for the driver's license of each driver and looking for signs of impairment.

The trial court's finding of fact 5 recognized that the plan provided for appropriate notifications to the public, including "signs and markers" and "patrol cars with their lights activated." Officer Pressley testified that the checkpoint was marked by "large 4 foot x 4 foot orange neon [signs stating] DWI check-in station ahead" and that there was "at least one car in the roadway in each direction with blue lights activated and all of the officers in the roadway [were] wearing their traffic vests." Moreover, because every vehicle was to be stopped, the plan provided that "[i]f traffic conditions create a[n] . . .

unreasonable delay to the convenience of the motoring public, the supervising officer may temporarily allow vehicles through without being stopped."

The trial court's findings — along with the competent evidence supporting these findings — establish that any interference with the individual liberty of citizens affected by the checkpoint was no greater than necessary to achieve the important objectives at issue. Therefore, the third prong of the *Brown* test was likewise satisfied.

We conclude that the trial court's findings of fact support its legal conclusion that the checkpoint comported with constitutional standards. Therefore, the trial court properly denied Defendant's motion to suppress.

## II. Refusal To Allow Offer of Proof

Defendant also argues that the trial court erred in refusing to allow him to make an offer of proof at trial. Defendant sought to impeach the credibility of Officer Pressley by questioning him about the basis for establishing the checkpoint at this particular location on Brookshire Boulevard. The trial court stated that it would "not allow Defendant to supplement [his] motion to suppress," but the court did agree to allow Defendant to question Officer Pressley on this subject for

the purpose of challenging his credibility. Defendant's counsel proceeded with this line of questioning. However, after counsel was able to elicit several responses from Officer Pressley, the trial court refused to allow any further questions on this issue.

> Q. Your testimony is that you know of a large amount of drinking establishments in this area. Can you name one of them –
>
> THE COURT: I'm going to stop you again. There has been no testimony in this trial about the number of drinking establishments. How does that go to his credibility? Tell the Court that.
>
> MR. SMITH: Your Honor, he testified -- I asked him the question why was the location picked. He said because of the number of drinking establishments in this location, the number of driving while impaired incidents and driving while impaired fatalities. That's exactly his testimony on the record. That was all in front of the jury.
>
> THE COURT: Sustained. I'm not going to allow it. You can make the objection for the record, and you can take it up with the court of appeals. I'm not going to allow it to be proffered. That's the Court's ruling.
>
> MR. SMITH: It can be proffered, according to the rules, for the purposes of appellate review, though.
>
> THE COURT: The Court has ruled.

MR. SMITH: I understand that, Your Honor. The
jury is not in the box right now.

THE COURT: That is correct.

MR. SMITH: The Court can't prevent –

THE COURT: I'm not going to let you go through
a whole line of testimony that the Court has already said it is not going to be proffered, so you can address that issue on appeal.

MR. SMITH: Your Honor, for the record, the Court is not allowing me to proffer this for appellate –

THE COURT: That is correct.

MR. SMITH: All right. Note my objection to that, Your Honor.

THE COURT: Noted for the record. Bring the jury in.

In *State v. Chapman*, 294 N.C. 407, 241 S.E.2d 667 (1978), our Supreme Court held that the failure of the trial court to allow counsel to make an offer of proof was a "regrettable judicial mistake." *Id*. at 415, 241 S.E.2d at 672. However, "where the witness has already answered the question sufficiently to demonstrate the immateriality of the inquiry, the judge's refusal to allow the preservation of the answer will not be held prejudicial error." *Id.*

Here, Defendant argues that the trial court's refusal to allow him to proffer evidence regarding Officer Pressley's personal knowledge of drinking establishments in the vicinity of the checkpoint constituted prejudicial error. However, Defendant had already pursued a similar line of questioning during his motion to suppress.

Assuming, without deciding, that the trial court's refusal to allow Defendant to make an offer of proof constituted error, we hold that the error was harmless. Defendant has failed to show why the evidence he elicited on this issue during the suppression hearing — which was made part of the record at that time — was insufficient to preserve this issue for appellate review. *See State v. Mackey,* 352 N.C. 650, 660-61, 535 S.E.2d 555, 560-61 (2000) (while trial court erred in denying party opportunity to make offer of proof, trial court's dialogue with defense counsel was sufficient to establish substance of proposed testimony such that error was harmless).

We likewise conclude that no prejudicial error occurred as a result of the trial court's limitation of defense counsel's ability to impeach Officer Pressley's credibility regarding the basis for establishing the checkpoint in this area. Even assuming *arguendo* that the trial court erred in not allowing

defense counsel to more fully pursue the line of questioning he desired on this issue, we are satisfied that any such error was harmless.

In order to show prejudicial error arising from the trial court's exclusion of evidence, the burden is on the defendant to establish that a reasonable possibility exists that a different result would have been reached but for the error. N.C. Gen. Stat. § 15A-1443(a) (2011). Here, in light of the evidence regarding Defendant's slurred speech and red and glassy eyes, the odor of alcohol on his breath, his poor performance on the field sobriety tests, and his .16 blood alcohol concentration level, it is highly unlikely that the jury would have reached a different verdict had the trial court allowed more extensive cross-examination on this issue. Accordingly, Defendant has failed to show prejudicial error.

## Conclusion

For the reasons stated above, we affirm the trial court's denial of Defendant's motion to suppress and hold that Defendant received a fair trial free from prejudicial error.

AFFIRMED IN PART; NO ERROR IN PART.

Judges HUNTER, JR. and ERVIN concur.

Report per Rule 30(e).